**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:25-cv-00055-O |
| | § | |
| STATE OF TEXAS, | § | |
| | § | |
| Defendant. | § | |

---

**EMERGENCY MOTION TO INTERVENE AND MEMORANDUM OF LAW IN
SUPPORT THEREOF OF PROPOSED DEFENDANT-INTERVENORS LA UNIÓN DEL
PUEBLO ENTERO, AUSTIN COMMUNITY
COLLEGE, AND OSCAR SILVA**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND......................................... 3

        a.      Texas Law Provides for In-State Tuition Regardless of
               Immigration Status.................................................................................. 3

        b.      The Parties Reached a Collusive Settlement. .............................. 4

        c.      Proposed Intervenors Have Suffered Harm from the Irregular
               Agreement to Invalidate the Law............................................................ 6

               i.      ACC .................................................................................... 6

               ii.     LUPE.................................................................................... 7

               iii.    Oscar Silva ........................................................................ 9

III.    ARGUMENT ...................................................................................................... 10

    A.      Proposed Intervenors Have Article III Standing................................... 10

    B.      Proposed Intervenors are Entitled to Intervention as of Right Under Rule
       24(a)(2). ................................................................................................. 11

        1.      The motion is timely. .................................................................. 12

               i.      Proposed Intervenors filed this motion
                    expeditiously................................................................... 12

               ii.     The Parties will not be prejudiced by this
                    expeditious intervention.................................................. 14

               iii.    Proposed Intervenors will suffer extreme prejudice
                    absent intervention. ......................................................... 14

               iv.     Unusual circumstances call for intervention.................... 15

        2.      Proposed Intervenors have substantial interests in this
               action........................................................................................ 16

        3.      Proposed Intervenors' ability to protect their substantial
               interests will be impaired absent intervention. ............................. 17

4.    Defendant has failed to adequately represent the interests
of Proposed Intervenors. .............................................................. 19

C.    In the Alternative, Proposed Intervenors Should be Granted Permissive
Intervention. ........................................................................................... 22

IV.    DEFENSE FOR WHICH INTERVENTION IS SOUGHT ............................................. 24

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856 (5th Cir. 2019) ........................................... 17

*Brumfield v. Dodd* 749 F.3d 339 (5th Cir. 2014) ........................................ 16, 17, 18, 21

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267 (2022) ..................................... 14

*Ceres Gulf v. Cooper*, 957 F.2d 1199 (5th Cir. 1992) ........................................... 12, 23

*City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012) .............................. 16

*City of Houston v. American Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012) .............. 19, 20

*Diaz v. S. Drilling Corp.*, 427 F.2d 1118 (5th Cir. 1970) ........................................... 16

*Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019) ......................................... 22

*Gen. Land Off. v. Trump*, No. 24-40447, 2025 WL 1410414, (5th Cir. 2025) ........................... 18

*Hopwood v. State of Tex.*, 21 F.3d 603 (5th Cir. 1994) .................................................. 19

*In re Lease Oil Antitrust Litig.*, 570 F.3d 244 (5th Cir. 2009) ....................................... 18

*Int'l Tank Terminals, Ltd. V. M/V Acadia Forest,* 579 F.2d 964 (5th Cir. 1978) ........................ 11

*John Doe No. 1 v. Glickman*, 256 F.3d 371 (5th Cir. 2001) ............................................ 18

*La Union del Pueblo Entero v. Abbott*, 29 F.4th 299 (5th Cir. 2022) ................................... 17, 18

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421  (5th
    Cir. 2011) ................................................................ 13, 16, 20

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992) ........................................................ 10

*Martinez v. Regents of Univ. of California*, 241 P.3d 855 (Cal. 2010) ........................................... 2

*Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994 (8th Cir. 1993) ............. 22

*Missouri v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2025 WL 1223581,
    (N.D. Tex. Apr. 28, 2025) ................................................................ 23

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452 (5th Cir.
    1984) ................................................................ 11

*Newby v. Enron Corp.*, 443 F.3d 416 (5th Cir. 2006) ................................................. 23

*Pool v. City of Houston*, 87 F.4th 733 (5th Cir. 2023) ................................................... 1

*Reid v. Gen. Motors Corp.*, 240 F.R.D. 257 (E.D. Tex. 2006) ...................................... 24

*Rotstain v. Mendez*, 986 F.3d 931 (5th Cir. 2021) ....................................................... 14

*Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004) (internal quotation and citation omitted) .............................................................................................................. 11

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) ........................................... 13, 16, 18

*State Farm Fire & Cas. Co. v. Evans*, No. 2:95CV174-B-A, 1996 WL 407545 (N.D. Miss. Apr. 19, 1996) .................................................................................... 23

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015) ............................. 11, 16, 17, 21

*Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) ............................. 11

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 n.10 (1972) ................. 19, 20

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977) ...................................... 13, 14

*United States ex rel. Hernandez v. Team Fin.*, L.L.C., 80 F.4th 571 (5th Cir. 2023) ................. 23

*United States v. Johnson*, 319 U.S. 302 (1943) (quotation omitted) ............................. 1

*United States v. LULAC*, 793 F.2d 636 (5th Cir. 1986) ............................................. 22

## Constitutional Provisions & Statutes

Tex. Ed. Code §§ 54.051(m) .......................................................................... 3, 5

Tex. Ed. Code §§ 54.052(a) ............................................................................ 3, 5

Tex. Ed. Code §§ 54.052(a)(3) ........................................................................... 3

Tex. Ed. Code §§ 54.053(3)(B) .......................................................................... 3

Tex. Gov't Code §§ 402.021 ............................................................................ 21

Tex. Gov't Code 402.010 ................................................................................. 21

## Rules & Regulations

Fed. R. Civ. P. 24(a)(2) ................................................................. 2, 10, 11, 12

Fed. R. Civ. P. 24(b)(1)(B) .............................................................................. 2

Fed. R. Civ. P. 24(c) ....................................................................................... 24

## I.    INTRODUCTION

On June 4, 2025, two days after the 89th Session of the Texas Legislature concluded, and within hours of filing suit, Plaintiff United States and Defendant State of Texas (the "Parties") brought to this Court for approval a Consent Judgment declaring a provision of Texas law unenforceable.  Dkts. 6, 8. That decades-old law guaranteed all eligible high school students in-state tuition at public higher education institutions. This Court did not have the benefit of adversarial briefing and, in its absence, accepted the Parties' joint submission, which summarily agreed that the Texas statute is preempted by a provision of federal law, 8 U.S.C. § 1623(a). But because the United States and Texas agreed and coordinated at every turn of this short-lived case, the Court was not alerted to significant jurisdictional and substantive defects in the Joint Motion for Consent Judgment. Dkt. 6. Indeed, because the parties were aligned, there was no justiciable "case" or "controversy" between Plaintiff and Defendant. "Such a suit is collusive because it is not in any real sense adversary. It does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process . . . which . . . [is] indispensable to adjudication of constitutional questions[.]" *United States v. Johnson*, 319 U.S. 302, 305 (1943) (quotation omitted); *see also Pool v. City of Houston*, 87 F.4th 733, 733-34 (5th Cir. 2023) ("It is well settled that, where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy."). Through their maneuvering, the Parties circumvented both the democratic and judicial processes and purported to undo a 24-year-old law that just two days prior the Texas Legislature had refused to repeal.

Proposed Intervenors Austin Community College ("ACC"), Oscar Silva ("Silva"), and La Unión del Pueblo Entero ("LUPE") (collectively, "Proposed Intervenors") are a college, a student, and a community organization directly impacted by the law. Proposed Intervenors request an

emergency ruling because the Court's June 4, 2025 Order and Final Judgment (the "Consent Order"), Dkt. 8—entered without subject matter jurisdiction—upended the lives and operations of Proposed Intervenors and countless other students. The resulting irreparable harm is manifest.

Since its passage in 2001, the Texas Dream Act guaranteed all eligible Texas high school graduates—regardless of their immigration status—in-state tuition at Texas state higher education institutions. This law made education attainable for countless individuals, enriching communities and contributing significantly to Texas's economy and workforce. Fifteen years ago, the Supreme Court of California concluded that 8 U.S.C. § 1623(a) does not preempt a statute similar to the Texas Dream Act. *Martinez v. Regents of Univ. of California*, 241 P.3d 855, 863 (Cal. 2010) ("The fatal flaw in plaintiffs' argument concerning section 1623 is their contention that [the] exemption from paying out-of-state tuition is based on residence. It is not. It is based on *other* criteria . . .".).

But this Court had no opportunity to consider this or other arguments in defense of the law, as none were made. Instead, in a matter of hours, and contrary to the recently-demonstrated will of the Texas Legislature, the Attorney General of Texas abdicated his duties and entered into a collusive agreement with the United States to abandon this longstanding protection for Texas students. *See* Dkt. 6. The United States and Texas subverted the judicial process and deprived those most impacted by the law's recission—and the democratically-elected legislators who days earlier chose to leave the Texas Dream Act in place—of a full adjudication of constitutionality.

Proposed Intervenors respectfully request the Court, on an emergency basis, grant them leave to intervene as defendants as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, grant them permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B). Proposed Intervenors also request, on an emergency basis, the Court vacate its Consent Order and fully adjudicate the Texas Dream Act's constitutionality.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### a.  Texas Law Provides for In-State Tuition Regardless of Immigration Status.

On June 16, 2001, Governor Rick Perry signed House Bill 1403, also known as the Texas Dream Act (the "Dream Act"), a landmark law passed with bipartisan support. This law made Texas the first state in the country to allow eligible students to pay in-state tuition at public colleges and universities—regardless of their citizenship or immigration status. Since its passage, twenty-five other states have followed in Texas's footsteps and passed similar laws.[1]

The Texas Education Code makes qualification for in-state tuition dependent on meeting certain requirements, none of which include immigration status. *See* Tex. Ed. Code §§ 54.051(m); 54.052(a). Section 54.052(a) sets out three standards under which any person can meet the requirements for in-state tuition. The subsection known as the Texas Dream Act, section 54.052(a)(3), provides that a student can meet the requirements by: (1) graduating from a Texas high school, (2) maintaining a residence in Texas for the three years prior to graduating high school, and (3) maintaining a residence in Texas for the year preceding enrollment in a higher education institution. *Id.* § 54.052(a)(3). In addition, a person who is not a citizen or permanent resident must submit an "affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible." *Id.* § 54.053(3)(B) .

This provision of law has allowed a generation of Texas students to enroll in college, earn undergraduate and graduate degrees, and enter the workforce in their home state of Texas. Without the Texas Dream Act, many students could not afford higher education, as out-of-state tuition rates

---

[1] App. 5 (Ex. 2, Chelsie Kramer, *Texas Dream Act: Protecting Undocumented Students' Access to Higher Education is Economic, Educational Imperative*, Immigr. Impact (Mar. 4, 2025), https://immigrationimpact.com/2025/03/04/texas-dream-act-undocumented-students-higher-education/#:~:text=As%20of%20the%20most%20recent%20data%2C%20approximately,Texas'%20workforce.%20The%20Economic%20Consequences%20of%20Repeal. [hereinafter "Immigration Impact"].)

are typically "three times higher than in-state rates."[2] For instance, at The University of Texas Rio Grande Valley, the 2024-2025 undergraduate in-state tuition and fees was approximately $9,986 per semester.[3] An out-of-state student would pay an estimated $22,286 for the same education. This significant cost difference is enough to prevent many from pursuing higher education.

The Texas Dream Act benefits students, their schools, and the State. In 2022, approximately 57,000 Dreamers received in-state tuition at Texas secondary and post-secondary education institutions.[4] Dream Act beneficiaries in 2021 accounted for less than 2% of students at their institutions, but provided significant tax benefits—a taxpayer with a Bachelor's degree pays approximately $2,000 more annually than a taxpayer who only finished high school.[5] Repeal of the Dream Act could cost Texas "more than $461 million annually in economic activity, including $244.4 million in lost wages and $216.9 million in diminished spending power."[6] Dreamers also create revenue for State institutions, paying significant tuition and fees—a net revenue benefit of $71 million, per a 2021 estimate.[7] Without the Texas Dream Act, many of these students will be forced to forgo their education, and schools across Texas will lose millions of dollars of funding.

### b.  The Parties Reached a Collusive Settlement.

During Texas's 89th Legislative Session, several bills, including HB 232 and SB 1798, targeted the Texas Dream Act; all died without making it to the House or Senate floor.

---

[2] App. 6 (*Id.*).

[3] App. 14–15 (Ex. 3, *Cost of Attendance*, Univ. of Tex. Rio Grande Valley, https://www.utrgv.edu/ucentral/paying-for-college/cost-of-attendance/index.htm (accessed June 12, 2025)).

[4] App. 106 (Ex. 9, Presidents' Alliance on Higher Education and Immigr., *Undocumented Students in U.S. Higher Education* (June 2024), https://www.presidentsalliance.org/wp-content/uploads/2024/07/Undocumented-Students-in-Higher-Education.pdf).

[5] App. 102 (Ex. 8, *Texas Dream Act Report*, Every Texan (May 2023), https://everytexan.org/wp-content/uploads/2023/05/Texas-Dream-Act-fact-sheet-May2023.pdf. Institutions include public universities, community colleges, technical and state colleges, and health-related programs. [hereinafter "Texas Dream Act Report"].)

[6] App. 7 (Ex. 2, *Immigration Impact*, *supra* note 1).

[7] App. 102 (Ex. 8, *Texas Dream Act Report*, *supra* note 5).

When the Legislature declined to repeal the Texas Dream Act, the United States circumvented the legislative process, turning to this Court. On June 4, 2025, two days after the Legislature adjourned with the law in full force, the United States filed this action. In its Complaint, the United States argued the Dream Act is preempted by the Illegal Immigration Reform and Immigrant Responsibility Act, resting its claim on 8 U.S.C. § 1623(a), which limits preference for noncitizens on the basis of residence in higher education benefits. *Id.* Section 1623(a) states:

> an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a). The United States' sole claim asserted that the Dream Act conflicts with § 1623(a) and violates of the Supremacy Clause of the U.S. Constitution. *Id.*

The United States did not even have to serve its lawsuit; Texas was ready and waiting. The United States filed an executed waiver of service, Dkt. 5, and hours later, on the same day the Complaint was filed, the Parties filed a Joint Motion for Consent Judgment. Dkt. 6. Without argument or any proceedings before this Court, the Parties agreed that sections 54.051(m) and 54.052(a) of the Texas Education Code were preempted by federal law. The Parties requested the Court enter declaratory judgment of the law's unconstitutionality and permanently enjoin the Texas Dream Act "as applied to aliens who are not lawfully present in the United States." *Id.* at 3.

In the absence of adversarial briefing, this Court promptly entered the Consent Order as the Parties jointly requested, and issued the Consent Order declaring the challenged provisions of the Texas Education Code unconstitutional and permanently enjoining the law just six hours after litigation was initiated. Dkt. 8. Later that day, Attorney General Ken Paxton's office released a statement applauding the end of the Dream Act: "Ending this discriminatory and un-American

provision is a major victory for Texas."[8] The U.S. Justice Department thanked the Texas Attorney General the next day for "for swiftly working with us" in the litigation.[9]

### c. Proposed Intervenors Have Suffered Harm from the Irregular Agreement to Invalidate the Law.

Proposed Intervenors are ACC, LUPE, and Oscar Silva. In the days since the Parties agreed to alter Texas law, they have already felt the effects of the collusive agreement.

### i. ACC

ACC is a public education institution serving Central Texas, and—with 40,000 credit students a semester and programs for associate degrees, career and technical certificates, and bachelor's degrees—is one of the largest community college system systems in the country.[10] ACC provides access to quality education to develop and enrich communities, especially for individuals from historically underrepresented and economically disadvantaged backgrounds.[11] Like most community colleges, ACC has a lean budget heavily dependent on tuition and fees, with funding from sources including state appropriations, property tax revenues, and federal and state grants.[12] Tuition revenue is a large portion of its budget essential to its operations; the loss of such payments will significantly and directly impact ACC.[13] The likely harm from a tuition revenue reduction is compounded by the uncertainty around the loss of this ordinarily-predictable revenue stream.[14]

ACC has 440 enrolled students affected by the Consent Order, who qualified for in-state

---

[8] App. 120 (Ex. 12, Ken Paxton Attorney General of Texas, *Attorney General Ken Paxton Successfully Strikes Down Unconstitutional Law that Gave In-State Tuition to Illegal Aliens* (June 4, 2025), https://texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-successfully-strikes-down-unconstitutional-law-gave-state-tuition. (Hereinafter "Attorney General Strikes Down Law").
[9] App. 131 (Ex. 14, U.S. Department of Justice, *The Justice Department, Texas Reach Agreement to End In-State Tuition for Illegal Aliens* (June 5, 2025), https://www.justice.gov/opa/pr/justice-department-texas-reach-agreement-end-state-tuition-illegal-aliens.).
[10] App. 140 (Ex. 16, Decl. of Russell Lowery-Hart, Ph.D., Chancellor, Austin Community College ¶ 2).
[11] *Id.*
[12] *Id.* (¶ 3).
[13] *Id.*
[14] *Id.*

tuition under the Dream Act.[15] With their sudden reclassification, ACC expects significant reductions in its enrollment and retention. ACC's low-income students could see tuition rates quadruple, from $1,020 to $4,236 for some.[16] A change so drastic and sudden is unprecedented, and will cause many students to withdraw from ACC, not to mention those who will be deterred from applying.[17] ACC expects a direct loss of hundreds of thousands of dollars.[18] ACC also faces uncertain administrative burdens, such as developing new systems to identify, track, and reclassify students by immigration status; recalculate tuition bills and manage appeals; and change guidance to students—all demanding significant staff and other resources to implement.[19] If not allowed to intervene, ACC will face irreparable harm to its, finances, campus community, and mission.[20]

### ii. LUPE

LUPE is a membership organization founded in 1989, advocating for the low-income community in Texas's Rio Grande Valley since 2003.[21] LUPE has around 8,000 dues-paying members in Texas and other states, some as young as high schoolers, and many of whom are undocumented.[22] LUPE's efforts include offering social services and providing resources for college-bound students.[23] Education access is core to LUPE's mission.[24] LUPE provides students and schools with information on higher education,[25] and assists undocumented students, and those with Deferred Action for Childhood Arrivals ("DACA") to understand eligibility for in-state

---

[15] App. 140–41 (*Id.* ¶ 4).
[16] App. 141 (*Id.* ¶ 5a).
[17] App. 141–42 (*Id.* ¶ 5).
[18] *Id.*
[19] App. 140–41 (*Id.* ¶ 4).
[20] App. 142–43 (*Id.* ¶ 6).
[21] App. 110 (Ex. 11, Decl. of Tania Chavez, LUPE ¶ 3).
[22] App. 111 (*Id.* ¶ 5).
[23] *Id.* (¶ 7).
[24] App. 112 (*Id.* ¶ 12).
[25] App. 113 (*Id.* ¶¶ 13–14).

tuition, including through its program, *¡Al Colegio Si Se Puede!*.[26] LUPE produces a guide to applying for college, addressing in-state tuition.[27] Its staff also train high school counselors on college access and in-state tuition.[28]

The Consent Order has affected LUPE's staff, outreach, advocacy, social media, print materials, and community relationships.[29] LUPE's staff has had to divert resources to support affected students, while working with schools to understand new tuition policies.[30] Tania Chavez, LUPE's Executive Director and President, has spent "hours each day communicating with partners and coordinating with volunteers in response to ensure our members understand the current state of the law" and "communicat[ing] with officials to better understand how the change in law will be implemented."[31] LUPE Youth, a social media account for those under age 25, has had to reorient its content.[32] LUPE's print materials, which cost significant resources, have become irrelevant.[33]

The most direct harm has been to LUPE members currently enrolled in higher education institutions: overnight, their tuition effectively tripled. At least six student members have contacted LUPE because they "are anxious and uncertain about their college futures."[34] They will be irreparably injured if forced to suspend their studies because they cannot cover the difference in tuition.[35] According to Chavez, the Consent Order "has frustrated [LUPE's] mission of helping

---

[26] App. 114 (*Id.* ¶ 16); App. 36–91 (Ex. 6, La Unión del Pueblo Entero, *¡Al colegio Si Se Puede!: Undocumented Student Guide* (2024), https://lupenet.org/wp-content/uploads/2024/08/al-colegio-si-se-puede-guide-56-pages.pdf.).
[27] App. 114 (Ex. 11, *supra* note 21 ¶ 16).
[28] App. 113 (*Id.* ¶ 14).
[29] App. 114–17 (*Id.* ¶¶ 18–24).
[30] App. 116–17 (*Id.* ¶¶ 22–24).
[31] App. 116 (*Id.* ¶ 22).
[32] App. 115 (*Id.* ¶ 19).
[33] App. 117 (*Id.* ¶ 24).
[34] *Id.* (¶¶ 25–27).
[35] *Id.*

undocumented students access higher education in Texas."[36]

### iii. Oscar Silva

Oscar Silva is a 24-year-old student who has lived in Texas since he was barely one year old.[37] He moved to Garland, Texas with his family in 2001—the same year the Texas Dream Act became law.[38] Silva grew up in Garland, where he graduated elementary, middle, and high school (as a member of the National Honor Society), before moving to Denton, Texas, where he currently resides.[39] Silva is now a student at the University of North Texas ("UNT") and is on track to graduate in Spring 2026 with a B.S. in Economics and an M.S. in Accounting.[40] He plans to work in Texas after graduating, applying his degrees to the work he has trained for and supporting himself, his family, and his community.[41]

Silva is able to attend UNT because of the Texas Dream Act.[42] A life-long Texan and Texas high school graduate, he has been eligible for in-state tuition.[43] This tuition benefit, plus earned scholarships and financial aid, made his education possible.[44] His graduation next spring hinges on his continued eligibility for in-state tuition; without it, he may be forced to withdraw from school in his last year.[45] Silva and his wife live on her teacher's salary and summer job.[46] He cannot afford to pay out-of-state tuition. UNT has never classified him as an out-of-state student, and he enrolled in the Fall Semester assuming that he would pay the in-state rate.[47] But, due to the

---

[36] App. 118 (*Id.* ¶ 29).
[37] App. 136 (Ex. 15, Decl. of Oscar Silva ¶ 2).
[38] *Id.*
[39] *Id.* (¶¶ 2, 4).
[40] *Id.* (¶ 3).
[41] *Id.* (¶ 13).
[42] *See* App. 136–37 (*Id.* ¶¶ 5–9, 14).
[43] App. 136 (*Id.* ¶¶ 2, 4–5).
[44] *See* App. 136–37 (*Id.* ¶¶ 5–9, 14).
[45] App. 136–37 (*Id.* ¶¶ 8–9).
[46] App. 136–37 (*Id.* ¶ 8).
[47] App. 136–37 (*Id.* ¶¶ 5, 9–12).

Consent Order, he fears his tuition could skyrocket before the August 20, 2025 payment deadline, and he may be forced to give up on his plans for his career and his future.[48]

### III.    ARGUMENT

Proposed Intervenors are entitled to intervention as of right under Federal Rule of Civil Procedure 24(a)(2) because the Parties have entered a collusive agreement to deprive Texas students and Proposed Intervenors of a direct and substantial interest, Texas has disclaimed any intent to defend its law conferring that interest, and no party adequately protects their interest.[49]

This motion is timely because less than three weeks have passed since the filing of this action (and entry of judgment), when the proposed intervenors first learned of this action. Proposed Intervenors have a substantial interest in this litigation, as the revocation of in-state tuition will cause significant hardship to LUPE and its members, ACC, and Silva. *See supra* Section II.c. Proposed Intervenors' ability to protect their interests will be further limited if they cannot intervene, as this Court has already entered the Consent Order following the collusive acts of the Parties, and little time remains for either existing Party to seek reconsideration or appeal. Finally, Texas has provided no defense of the Dream Act and thus has failed to adequately represent Proposed Intervenors' interests. Should the Court find Proposed Intervenors are not entitled to intervene as of right, the Court should still grant them permissive intervention in this action.

### A.  Proposed Intervenors Have Article III Standing.

Proposed Intervenors have standing to proceed and seek relief different from that agreed to by the Parties. Under Article III, a party must demonstrate (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992). If multiple parties seek to intervene, only one must establish standing. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S.

---

[48] App. 137–38 (*Id.* ¶¶ 9–15).
[49] *See* App. 120 (Ex. 12, *Attorney General Strikes Down Law*, *supra* note 8).

433, 439 (2017). Here, Proposed Intervenor Silva faces direct injury from the attack on the Texas

Dream Act: his tuition will likely rise drastically, and he may be forced to withdraw from school.[50]

ACC must hastily determine its obligations to alter tuition determinations and policies, and its

enrollment, and tuition dollars, will likely drop substantially.[51] LUPE has had to divert significant

resources to respond to this case, and its student members may no longer be able to afford tuition.[52]

These injuries are all caused by the Consent Order and the United States' suit against the Texas

Dream Act and can be directly redressed through proper defense of the law in this action.

### B.  Proposed Intervenors are Entitled to Intervention as of Right Under Rule 24(a)(2).

A non-party has the right to intervene in an action pursuant to Federal Rule of Civil

Procedure 24(a)(2) when it satisfies four conditions:

> (1) the application for intervention must be timely; (2) the applicant must have
> an interest relating to the property or transaction which is the subject of the
> action; (3) the applicant must be so situated that the disposition of the action
> may, as a practical matter, impair or impede his ability to protect that interest;
> (4) the applicant's interest must be inadequately represented by the existing
> parties to the suit.

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984)

(quoting *Int'l Tank Terminals, Ltd. V. M/V Acadia Forest,* 579 F.2d 964, 967 (5th Cir. 1978)).

The Fifth Circuit construes Rule 24(a) broadly to favor intervenors. *See Saldano v. Roach*,

363 F.3d 545, 551 (5th Cir. 2004) (internal quotation and citation omitted); *Texas v. United States*,

805 F.3d 653, 657 (5th Cir. 2015) ("Federal courts should allow intervention where no one would

be hurt and the greater justice could be attained"). The standard for intervention of right "is a

flexible one, which focuses on the particular facts and circumstances surrounding each

---

[50] App. 137 (Ex. 15, *supra* note 37 ¶¶ 9–14).
[51] App. 141–42 (Ex. 16, *supra* note 10 ¶ 5).
[52] App. 114–18 (Ex. 11, *supra* note 21 ¶¶ 18–29).

application" and is "measured by a practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (internal quotation marks omitted) (citations omitted). Proposed Intervenors meet each Rule 24(a)(2) factor and so should be granted leave to intervene.

### 1. The motion is timely.

Proposed Intervenors' motion is timely. There is no precise definition of timeliness for intervention. Rather, "[t]imeliness is to be determined from all the circumstances." *Edwards*, 78 F.3d at 1000 (quotation omitted). The Fifth Circuit has set out four factors to guide the inquiry in *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977). Those factors are:

> (1) "The length of time during which the would-be intervenor actually know[s] or reasonably should have known of his interest in the case before he petitioned for leave to intervene," (2) "The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case," (3) "The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied," and (4) "The existence of unusual circumstances militating either for or against a determination that the application is timely."

*Id.* at 264–66. Whether a party seeks intervention before or after final judgment is "of limited significance to timeliness. *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992) (quoting *Stallworth*, 558 F.2d. at 266). Here, Proposed Intervenors meet each of *Stallworth* factors.

### i. Proposed Intervenors filed this motion expeditiously.

Given the unusual nature of this case—a complaint and final judgment all filed in less than one day—Proposed Intervenors have filed this motion expeditiously. The relevant length of time during which proposed intervenors were, or should have been, aware of their interest in the litigation "runs either from the time the applicant knew or reasonably should have known of his interest, . . . or from the time he became aware that his interest would no longer be protected by the existing parties." *Edwards*, 78 F.3d at 1000 (citing *Stallworth*, 558 F.2d at 264).

Here, those two dates are the same. The United States filed its action, Texas agreed to the relief sought, and the Court entered judgment on June 4, 2025. Proposed Intervenors could only have been aware of their interest once the case was filed, and they learned conclusively that they would not be protected when the Attorney General agreed with the United States and sought a consent judgment. Proposed Intervenors file this motion on June 24, 2025, a mere nineteen days after learning of the matter and their interest. They have acted expeditiously to respond to complex litigation in a unique procedural posture less than three weeks after the action both commenced and ended. This timeline is more than reasonable, as the Fifth Circuit has repeatedly confirmed.

In *Stallworth* itself, the benchmark for timeliness, intervenors filed their motion just short of one month after entry of the consent order in question, and three weeks after they were affected by the order, 558 F.2d at 262, which the Court found "discharged their duty to act quickly." *Id.* at 267. *See also League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434 (5th Cir. 2011) [hereinafter "LULAC"] (Four weeks after entry of order modifying consent decree was a "fairly short period of time for a person to obtain counsel, explore his legal options, and file a motion to Intervene."); *Edwards*, 78 F.3d at 1000 (motions filed 37 and 47 days after notice of decree in question was published were timely); *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (motion filed within two months of learning interests were affected was timely).

Moreover, Proposed Intervenors' Motion falls comfortably within critical jurisdictional deadlines to file a motion for reconsideration under Federal Rule of Civil Procedure 59(e), an appeal under Federal Rule of Appellate Procedure 4, and motions for relief from the judgment under Federal Rule of Civil Procedure 60. *Cf. United Airlines, Inc. v. McDonald*, 432 U.S. 385, 390 (1977) ("Her motion was filed . . . within the 30-day period for an appeal to be taken."). Having been filed only nineteen days after Proposed Intervenors knew, or could have known, of their

interest, and before any jurisdictional deadlines, this motion satisfies the first *Stallworth* factor.

### ii. The Parties will not be prejudiced by this expeditious intervention.

On the second *Stallworth* factor, "the relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest." 558 F.2d at 267. The *Stallworth* Court found no prejudice in a one-month delay. *Id.*; *see also United Airlines, Inc. v. McDonald*, 432 U.S. 385, 393 n.14 (1977) (filing three weeks after final judgment did not prejudice existing parties).

Here, the Parties are in the same position as they were three weeks ago. No discovery has been taken, nor evidence produced to date, and there is no risk that materials relevant to the litigation have been altered or discarded in the interim. *See id.* ("There is no reason to believe that in that short period of time United discarded evidence or was otherwise prejudiced."). The Parties "may have hoped" no one would defend the Texas Dream Act, "but they had no legally cognizable expectation." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 282 (2022). Thus, the Parties have not suffered from the minimal time between entry of the Consent Order and the filing of this Motion, and Proposed Intervenors have satisfied the second timeliness factor.

### iii. Proposed Intervenors will suffer extreme prejudice absent intervention.

The third factor looks to whether a would-be intervenor "may be seriously harmed if he is not permitted to intervene[.]" *Stallworth*, 558 F.2d at 266. "[C]ritical to the third *Stallworth* inquiry is adequacy of representation. If the proposed intervenors' interests are adequately represented, then the prejudice from keeping them out will be slight." *Rotstain v. Mendez*, 986 F.3d 931, 936 (5th Cir. 2021) (quotation omitted). But where the parties do not adequately represent proposed intervenors' interests, the prejudice could be significant.

Here, Proposed Intervenors have direct and personal stakes in the litigation. ACC's administrative operations have been upended by the need to assess tuition payments in an entirely new manner.[53] ACC anticipates a significant drop in enrollment, and revenue.[54] Silva faces a significant increase in his tuition, which could mean the difference between graduating and being forced to withdraw.[55] LUPE has had to redirect resources to support impacted members, and some members now cannot afford their education.[56] Proposed Intervenors seek to ensure their interests are represented for the first time in this litigation. Without intervention, Proposed Intervenors cannot seek reconsideration or appeal. With no other avenue to protect their significant interest, Proposed Intervenors will face extreme prejudice if not allowed to intervene.

### iv.  Unusual circumstances call for intervention.

The final factor allows for consideration of any unusual circumstances warranting intervention. In *Stallworth* the Court recognized unusual circumstances where "the plaintiffs urged the district court to make it more difficult for the appellants to acquire information about the suit early on," such that the plaintiffs could not contest timeliness. 558 F.2d at 267.

Here, the entire course of litigation is unusual and favors intervention. The United States filed suit a mere two days after the Legislature declined to repeal the Texas Dream Act—a 24-year-old law upon which thousands of Texas students depend. When the Parties failed to achieve their desired outcome through the democratic process, the United States coordinated with the Texas Attorney General to disclaim any defense of State law and to agree in mere hours to a judicial decree. These circumstances are highly unusual and demonstrate the necessity of intervention to protect the interests of Proposed Intervenors.

---

[53] App. 141–42 (Ex. 16, *supra* note 10 ¶ 5).
[54] App. 141–42 (*Id.* ¶ 5).
[55] App. 137 (Ex. 15, *supra* note 37, ¶¶ 9–14).
[56] App. 116–17 (Ex. 11, *supra* note 21, ¶¶ 22–27).

### 2.   Proposed Intervenors have substantial interests in this action.

Proposed Intervenors have substantial interests in this case. The second factor in the Rule 24(a) inquiry requires intervenors to possess a substantial interest affected by the litigation. "Although [t]here is not any clear definition of the nature of the interest . . . that is required for intervention of right" in the Fifth Circuit, Rule 24(a)(2) generally "require[s] a direct, substantial, legally protectable interest in the proceedings" that "goes beyond a generalized preference that the case come out a certain way." *Texas*, 805 F.3d at 657 (quotations omitted) (cleaned up).

The Fifth Circuit has found economic, property, and other interests sufficient to meet this requirement, so long as "they are concrete, personalized, and legally protectable." *Id.* at 658–59 (citing *LULAC*, 659 F.3d 421 (interest in right to vote for city council members was sufficient for intervention)); *see also Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970) (tax lien was sufficient interest); *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012) (organizers of petition drive to amend city charter had specific interest in defending the amendment for intervention). In addition, the opportunity for "briefing of issues, presentation of evidence, and ability to appeal" is relevant to the extent of prejudice absent intervention. *Espy*, 18 F.3d at 1207.

In *Brumfield v. Dodd*, concerning a consent decree between Louisiana and the United States over a voucher program, the Fifth Circuit reversed denial of intervention to parents of children receiving school vouchers. 749 F.3d 339 (5th Cir. 2014) The parents had an interest in a potential decree that interfered with education access for their children, with "a potential bar on certain kinds of vouchers" and scholarships. *Id.* at 344. The Court explained, although the United States denied an intent to end the voucher program or scholarships, "[t]he possibility is . . . real that if the parents are not able adequately to protect their interests, some students who otherwise would get vouchers might not get them or might not get to select a particular school they otherwise

would choose." *Id.* Noting that "[t]he parents need not wait to see whether that ultimately happens [,]" the Court held "they ha[d] already described an interest justifying intervention." *Id.*

Here, as in *Brumfield*, the underlying action, regarding education access, implicates a substantial interest of Proposed Intervenors. But, whereas in *Brumfield* the impact was only speculative, here the Parties have cancelled the educational benefit entirely, without any defense by Texas. Proposed Intervenors "have a real, concrete stake in the outcome of this litigation[.]" *Texas*, 805 F.3d at 661. Proposed Intervenors "are not individuals seeking to defend a governmental policy they support on ideological grounds; rather, they are the intended beneficiaries of the program." *Id.* Absent intervention to defend the Dream Act, ACC's operations will be thrown into disarray, and its enrollment and revenue will drop precipitously;[57] Silva and LUPE's members will face vastly higher tuition, and may have to withdraw from school;[58] and LUPE will divert resources from other vital services.[59] Proposed Intervenors all have concrete interests in higher education for students who comply with all requirements for in-state tuition. They have satisfied the second factor for intervention as of right.

### 3. Proposed Intervenors' ability to protect their substantial interests will be impaired absent intervention.

Proposed Intervenors' ability to protect their articulated interests will be impaired if they cannot participate in the action. The Fifth Circuit has stated, "[t]he impairment must be practical . . . and not merely theoretical." *Brumfield*, 749 F.3d at 344 (quotation omitted); *see also La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022) ("[Intervenors] need only show that if they cannot intervene, there is a possibility that their interest could be impaired or impeded.") (quotation omitted); *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 867 (5th Cir. 2019)

---

[57] App. 141–42 (Ex. 16, *supra* note 10 ¶ 5).
[58] App. 137 (Ex. 15, *supra* note 37 ¶¶ 9–14); App. 117 (Ex. 11, *supra* note 21 ¶¶ 25–27).
[59] App. 114–18 (Ex. 11, *supra* note 21 ¶¶ 18—24, 28–29).

("[T]he text of Rule "4 and [Fifth Circuit] precedent[] . . . focus[] on practical consequence."). The Fifth Circuit has recently confirmed, "the impairment analysis mirrors the *Stallworth* factor three analysis." *Gen. Land Off. v. Trump*, No. 24-40447, 2025 WL 1410414, at *9 (5th Cir. 2025).

In *Brumfield*, the parents satisfied this factor with the potential that their "access to vouchers will be impaired because a decline in prospects for obtaining vouchers may well result," even where no change to the voucher program had yet been made. 749 F.3d at 345. Elsewhere, the Fifth Circuit found intervening political committees to have demonstrated potential impairment of their interests in litigation over a law that "makes several amendments to the Texas Election Code which change the entire election landscape for those participating as the Committees' members and volunteers." *La Union del Pueblo Entero*, 29 F.4th at 307. The Court also found intervention as of right warranted in a dispute over distribution of unclaimed settlement funds where, on this factor, "[b]arring intervention, the funds will be distributed [elsewhere], and the [intervenor] will not be able to claim the interest." *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 251 (5th Cir. 2009).

And in *Sierra Club v. Espy*, impairment to property interests in sales contracts, economic interests in timber harvesting, and "legal rights associated with formal intervention, namely the briefing of issues, presentation of evidence, and ability to appeal" were sufficient to require intervention. 18 F.3d 1202, 1206–07 (5th Cir. 1994). An intervenor's interests may also be impaired by the preclusive effects of a decision in which they are not allowed to participate. *See*, *e.g.*, *John Doe No. 1 v. Glickman*, 256 F.3d 371, 380 (5th Cir. 2001) ("If not allowed to intervene, the . . . ruling could collaterally estop the [Intervenor] from re-litigating the Issue.").

Here, Proposed Intervenors' interests are plainly impaired by their exclusion from the suit. *See supra* Section II.c. Additionally, in the absence of intervention, no current Party has defended, or will ever defend, the Texas Dream Act or the interests it protects—whether through appeal,

seeking vacatur or amendment of the judgment, or otherwise—as Proposed Intervenors seek the right to do. Therefore, Proposed Intervenors have demonstrated a substantial impairment of their interest, which they can protect against only through intervention.

### 4. Defendant has failed to adequately represent the interests of Proposed Intervenors.

Defendant has failed to adequately represent the interests of Proposed Intervenors, satisfying the final factor. A proposed intervenor must establish the parties are unable to adequately represent their interest in the suit. The burden on intervenors is low, and is satisfied even when the representation "may be inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) An intervenor must overcome two presumptions of adequate representation to demonstrate entitlement to intervene, both of which are overcome here. *Edwards*, 78 F.3d at 1005.

First, "when the putative representative is a governmental body or officer charged by law with representing the interests of the absentee, a presumption of adequate representation arises whether the would-be intervenor is a citizen or subdivision of the governmental entity." *Id.* An intervenor must show "that its interest is in fact different from that of the state and that the interest will not be represented by the state." *Hopwood v. State of Tex.*, 21 F.3d 603, 605 (5th Cir. 1994). In *City of Houston v. American Traffic Solutions, Inc.*, for example, the Fifth Circuit reversed a denial of intervention as of right sought by the organizers of a successful petition drive to amend the Houston city charter to disallow use of red-light cameras. 668 F.3d 291 (5th Cir. 2012) The City filed a declaratory judgment action against its traffic camera operator to clarify the parties' rights under their contract after the amendment passed. The parties jointly agreed not to remove the cameras during the pendency of litigation, and the district court entered an interlocutory ruling in favor of the camera operator before the intervenors sought to join the suit. *Id.* at 293.

Considering their appeal from denial of intervention as of right, the Fifth Circuit noted the

intervenors "raised substantial doubts about the City's motives and conduct in . . . litigation." *Id.*
at 294. The Court reasoned, if the intervenors did not defend the amendment, "the City might well
be inclined to settle the litigation on terms that preserve the adverse ruling[.]" The Court noted that
the matter implicated "millions of dollars of revenue", the "haste of the litigation," "the extended
opposition to the charter amendment, the agreed order to leave the cameras in place, and the
attempt to reinstate them before the suit had concluded . . . ." *Id.* Thus, the Fifth Circuit held, "[t]he
district court erred in declaring that the [intervenors] had to prove a meaningful probability [of
inadequate representation] derived from actual facts. . . . [I]t is sufficient to conclude that the
intervenors' interests may be inadequately represented." *Id.* (quoting *Trbovich*, 404 U.S. at 538
n.10 (quotation marks omitted)); *see also LULAC*, 659 F.3d at 435 ("The existing parties"
including the city defendant "oppose the relief that [the intervenor] seeks; thus, they do not
adequately represent his interest. Therefore, [he] fulfills all four requirements of Rule 24(a)(2).").

Here, Texas has disclaimed any desire or intention to defend the Texas Dream Act, under
which Proposed Intervenors have been able to access education, offer affordable college programs,
or assist others attaining educational opportunities. To the contrary, the Attorney General made a
public statement *applauding* the end of the Texas Dream Act.[60] Like in *City of Houston*, this suit
implicates millions of dollars of state revenue; was undertaken and ended in haste; concerns a law
that, while Texas legislators have declined to repeal, the Attorney General himself opposed; and
concluded in a Consent Order in a matter of hours, all before Proposed Intervenors could defend
their interests. Analogous facts were sufficient in *City of Houston* to conclude the intervenors'
interests may be inadequately represented, satisfying the fourth *Stallworth* factor. Here too,
Proposed Intervenors have shown Texas does not represent their interests adequately—or at all.

---

[60] *See* App 120 (Ex. 12, Attorney General Strikes Down Law, *supra* note 8).

The second presumption of adequate representation "arises when the would-be intervenor has the same ultimate objective as a party to the lawsuit. In such cases, the applicant for intervention must show adversity of interest, collusion, or nonfeasance on the part of the existing party to overcome the presumption." *Edwards*, 78 F.3d at 1005. In *Texas v. United States*, the Fifth Circuit reversed a denial of intervention as of right to potential recipients of Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") in a challenge to that law. 805 F.3d at 663. The Fifth Circuit held the DAPA recipients had interests sufficiently divergent from the United States' in defending the program sufficient to justify intervention, even though both the putative intervenors and the federal government sought to defend DAPA from suit by Texas. *Id.*

There, the putative intervenors' "interests diverge[d] from the Government's" because the United States sought to "secur[e] an expansive interpretation of executive authority, efficiently enforce[e] the immigration laws, and maintain[] its working relationship with the States," whereas the putative intervenors sought to "remain in their long-time home state," "retain custody of their U.S. Citizen children," and obtain driver's licenses and other legal documentation to "provide for their families." *Id.* This divergence of interests came to the fore when the United States conceded that a state could withhold a driver's license from a DAPA recipient, in direct contravention of the interests of the putative intervenors. *Id.*; *see also Brumfield*, 749 F.3d at 346 ("The lack of unity in all objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate."). The Fifth Circuit also took into account misconduct by the United States as relevant to its finding of inadequacy of representation. *Texas*, 805 F.3d at 663–64. The Fifth Circuit held, based on this evidence, the putative intervenors had "rebutted the presumption of adequate representation by showing adversity of interest[.]" *Id.*

Here, while Texas usually defends its own laws, *see* Tex. Gov't Code §§ 402.021; 402.010,

the Attorney General's behavior belies any adequacy of representation. The circumstances here demonstrate an "adversity of interest," between Texas and Proposed Intervenors, in addition to "collusion," and even "nonfeasance," by Texas, sufficient to overcome the presumption. Proposed Intervenors seek to defend their interest in access to education in Texas. The State has shown no desire to vindicate that interest. Rather, Texas has pursued an interest only in collaborating—or colluding—with the Federal Government in this action. *See Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 1001 (8th Cir. 1993) (misalignment of interests overcame the presumption where, "if the case is disposed of by settlement rather than by litigation, what the state perceives as being in its interest may diverge substantially from [Intervenors' interests].").

Therefore, able to overcome both presumptions of adequacy of representation, Proposed Intervenors are not adequately represented by Defendant and are thus entitled to intervene here.

### C.  In the Alternative, Proposed Intervenors Should be Granted Permissive Intervention.

The Court should allow Proposed Intervenors to intervene as of right. But even if the Court disagrees, it should still grant permissive intervention. *See e.g.*, *United States v. LULAC*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting intervention as of right, it might have granted permissive intervention . . . because the intervenors raise common questions of law and fact."); *Stallworth*, 558 F.2d at 270 ("With little strain on the court's time and no prejudice to the litigants, the controversy can be stilled and justice completely done if the appellants are granted permission to intervene.") (citation omitted) (quotations omitted); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 940 (N.D. Tex. 2019) ("Even if Putative Intervenors could not establish that they are entitled to intervene as of right, the Court would allow them to intervene permissively.").

Permissive intervention under Federal Rule of Civil Procedure 24(b) involves a two-step inquiry: "First, the district court must decide whether the applicant's claim or defense and the main

action have a question of law or fact in common" and then it "must exercise its discretion in deciding whether intervention should be allowed." *Stallworth*, 558 F.2d at 269 (quotation omitted). Courts have granted permissive intervention when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *Missouri v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2025 WL 1223581, at *4 (N.D. Tex. Apr. 28, 2025). "The 'claim or defense' portion of Rule 24(b) . . . [is] construed liberally." *United States ex rel. Hernandez v. Team Fin.*, L.L.C., 80 F.4th 571, 577 (5th Cir. 2023) (quoting *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006)); *see id.* at 578–79 (reversing and remanding denial of permissive intervention to nonparty).

Permissive intervention is also warranted post-judgment. For instance, in *State Farm Fire & Cas. Co. v. Evans*, a district court granted permissive intervention after final judgment, noting, "the Fifth Circuit has allowed post-judgment intervention on a number of occasions." *State Farm Fire & Cas. Co. v. Evans*, No. 2:95CV174-B-A, 1996 WL 407545, at *1 (N.D. Miss. Apr. 19, 1996) (citing *Ceres Gulf*, 957 F.2d at 1203). There, the defendant was in prison for manslaughter. *Id.* The decedent's family sued him and the insurer in state court to determine coverage. *Id.* Concurrently, State Farm filed a federal suit against only the defendant and did not notify the decedent's family. *Id.* When the incarcerated defendant did not respond, State Farm obtained a default judgment, which it attempted to use to avoid liability in state court. *Id.* When the decedent's family learned of State Farm's suit, they filed a motion to permissively intervene and set aside the judgment, both of which the court granted. *Id.* The court reasoned: "this case presents a unique situation wherein the defendant . . . has shown no interest in defending the declaratory judgment action. Therefore, not only are the intervenors not adequately represented by other parties, but their

absence inhibits the full development of the factual issues." *Id.* at *2. Thus, the court allowed the intervenors to permissively intervene. *Id.*

Here, the motion for intervention is timely, as discussed above. *See supra* Section III.b.1. Proposed Intervenors raise questions of law in common with the action, as they seek to defend the Texas Dream Act as constitutional—the sole issue in the suit. *See Reid v. Gen. Motors Corp.*, 240 F.R.D. 257, 260 (E.D. Tex. 2006). Further, Texas has declined to defend the action, and Proposed Intervenors seek to defend their interests, and the interests of Texas students, in this Court. Lastly, intervention will cause no undue prejudice or delay, as Proposed Intervenors seek to defend Texas's own law and ensure the litigation the United States initiated runs its proper course. The Texas Dream Act has been law since 2001 and should not be undone without due consideration. Thus, the Court should grant Proposed Intervenors permissive intervention.

## IV.    DEFENSE FOR WHICH INTERVENTION IS SOUGHT

Proposed Intervenors seek to defend the Texas Dream Act before this Court and to provide argument and evidence in support of maintaining in-state tuition for all eligible Texas students. Pursuant to Rule 24(c), Proposed Intervenors seek leave to intervene and file the following: Emergency Motion for Relief from Judgment or, in the Alternative, Motion to Alter or Amend Judgment, under Rules 59 and 60;[61] and Emergency Motion for Stay of Judgment, to stay the injunction pending final resolution of their motions to intervene and to vacate judgment. If the Court allows intervention and vacates the Consent Order, Proposed Intervenors are prepared to serve as defendants for the duration of the litigation, starting with a motion to dismiss the Complaint. Alternatively, Proposed Intervenors seek leave to intervene for purposes of appeal.

---

[61] Proposed Intervenors file their Motion to Vacate pursuant to Federal Rule of Civil Procedure 24(c), setting out the defenses for which intervention is sought. If in addition the Court requires an answer or motion to dismiss to satisfy Rule 24(c), Proposed Intervenors respectfully request an extension of 30 days from the Court's ruling on this Motion to file such pleading.

Given the urgency of the issue, Proposed Intervenors request expedited consideration of their motions. Enrollment decisions, tuition assessments, and deposit deadlines are approaching at institutions across Texas, and the Texas Higher Education Coordinating Board, on June 18, 2025, instructed that "each institution must assess the population of [affected] students," for tuition adjustment, requiring immediate action by colleges.[62] Proposed Intervenors have reason to believe additional guidance could issue as soon as July 24, 2025. Based on these considerations, and to allow time for an appeal, if necessary, Proposed Intervenors respectfully request, to the extent possible, the Court require any responses to this Motion and their Emergency Motion for Stay within one week; any replies within three days of any response; and a ruling by July 11, 2025.

## V.    CONCLUSION

Proposed Intervenors respectfully request this Court grant them leave to intervene, as well as any additional relief to which they may show themselves entitled.

---

[62] App. 108 (Ex. 10, Memorandum from Texas Higher Education Coordinating Board).

Dated: June 24, 2025                                Respectfully submitted,

                                                    */s/ Andrés Correa*
                                                    Andrés Correa
                                                    Texas Bar No. 24076330
                                                    acorrea@lynnllp.com
                                                    Christopher Patton
                                                    Texas Bar No. 24083634
                                                    cpatton@lynnllp.com
                                                    Yaman Desai
                                                    Texas Bar No. 24101695
                                                    ydesai@lynnllp.com
                                                    Kyle A. Gardner
                                                    Texas State Bar No. 24116412
                                                    kgardner@lynnllp.com
                                                    Zhenmian Xu
                                                    Texas Bar No. 24135820
                                                    sxu@lynnllp.com
                                                    **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                                    2100 Ross Avenue, Suite 2700
                                                    Dallas, Texas 75201
                                                    (214) 981-3800 Telephone
                                                    (214) 981-3839 Facsimile


                                                    Kassandra Gonzalez*
                                                    Texas Bar No. 24116439
                                                    kassandra@texascivilrightsproject.org
                                                    Molly Petchenik
                                                    Texas Bar No. 24134321
                                                    molly@texascivilrightsproject.org
                                                    Daniel Woodward*
                                                    Texas Bar No. 24138347
                                                    danny@texascivilrightsproject.org
                                                    **TEXAS CIVIL RIGHTS PROJECT**
                                                    P.O. Box 17757
                                                    Austin, TX 78760
                                                    (512) 474-5073 ext. 182 Telephone
                                                    (512) 474-0726 Facsimile


                                                    Daniel Hatoum*
                                                    Texas Bar No. 24099136
                                                    daniel@texascivilrightsproject.org
                                                    **TEXAS CIVIL RIGHTS PROJECT**

---

1017 W. Hackberry Ave.
Alamo, TX 78516
(512) 474-5073 ext. 182 Telephone
(512) 474-0726 Facsimile


Efrén C. Olivares
Texas Bar No. 24065844
Federal Bar No. 1015826
olivares@nilc.org
**NATIONAL IMMIGRATION LAW CENTER**
P.O. Box 34573
Washington, DC 20005-9997
 (213) 674-2817 Telephone


David Donatti
Texas Bar No. 24097612
Adriana Pinon
Texas Bar No. 24089768
Edgar Saldivar
Texas Bar No. 24038188
Sarah Corning*
Texas Bar No. 24144442
**ACLU FOUNDATION OF TEXAS**
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
ddonatti@aclutx.org
apinon@aclutx.org
esaldivar@aclutx.org
scorning@aclutx.org


Joshua M. Salzman*
D.C. Bar No. 982239
jsalzman@democracyforward.org
Brian D. Netter*
D.C. Bar No. 979362
bnetter@democracyforward.org
Paul R.Q. Wolfson*
D.C. Bar No. 414759
pwolfson@democracyforward.org
Skye L. Perryman*
Texas Bar No. 24060411
sperryman@democracyforward.org

**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PROPOSED INTERVENORS LA UNIÓN DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that pursuant to LR 7.1, on June 23, 2025, the undersigned emailed counsel for the Parties asking whether they could agree to the relief requested herein. Counsel for the State of Texas is opposed. As of this filing, counsel for the Parties have not responded.

*/s/ Andrés Correa*
Andrés Correa

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

*/s/ Andrés Correa*
Andrés Correa