UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL No. 7:25-CV-00055-O |
| | § | |
| STATE OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

---

**EMERGENCY MOTION FOR RELIEF FROM JUDGMENT OR, IN THE
ALTERNATIVE, MOTION TO ALTER OR AMEND JUDGMENT, AND
MEMORANDUM OF LAW IN SUPPORT THEREOF OF PROPOSED
DEFENDANT-INTERVENORS LA UNIÓN DEL PUEBLO ENTERO,
AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

---

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................. 1

II.     BACKGROUND .................................................................................................................. 3

   A.   The Texas Dream Act Expands Education in Texas. ........................................................ 3

   B.   The Texas Legislature Refuses to Repeal the Dream Act for Twenty-Four Years. ........... 5

   C.   The United States and The State of Texas Collude to Take Down the Dream Act. ........... 6

   D.   The Consent Order Risks Imminent Harm to Intervenors and Across Texas.................... 7

III.    ARGUMENT ..................................................................................................................... 11

   A.   The Court Should Vacate the Consent Order Pursuant to Rule 60(b). ............................ 11

      1.   Rule 60(b)(4) Warrants Relief Based Upon Lack of Subject Matter Jurisdiction and Due
      Process. ......................................................................................................................... 11

      2.   Rule 60(b)(1) Warrants Relief Based Upon Surprise to Intervenors. .......................... 15

      3.   Alternatively, Extraordinary Circumstances Justify Relief Under Rule 60(b)(6). ....... 18

   B.   The Court Should Vacate the Consent Order Pursuant to Rule 59(e). ............................ 20

IV.     CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................. 13

*Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-CV-4295, 2012 WL
    1952265 (S.D. Tex. May 30, 2012) ................................................................. 21

*Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308 (N.D. Tex. 2004) ............................ 15, 16, 18

*Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289 (5th Cir. 2015) ................................ 2, 11

*Buck v. Davis,* 580 U.S. 100 (2017) .................................................................................. 18

*Bullard v. Estelle*, 708 F.2d 1020 (5th Cir. 1983) ............................................................ 12

*Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204 (5th Cir. 2003) .................................. 13

*Camp v. Putnam*, 807 F. App'x 303 (5th Cir. 2020) ....................................................... 20

*Carter v. Fenner*, 136 F.3d 1000 (5th Cir. 1998) ............................................................ 11

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .................................................... 2

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ............................................... 22

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350 (5th Cir. 1993) ..................... 3, 20

*F.D.I.C. v. SLE, Inc.*, 722 F.3d 264 (5th Cir. 2013) ........................................................ 13, 21

*Foman v. Davis*, 371 U.S. 178 (1962) .............................................................................. 3

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................................................ 13

*Gabarick v. Laurin Mar. (Am.) Inc.*, No. CIV.A. 08-4007, 2010 WL 5437391 (E.D.
    La. Dec. 23, 2010) ......................................................................................... 21

*Goss v. Lopez*, 419 U.S. 565 (1975) ............................................................................. 2, 13, 14

*Hartford Life and Acc. Ins. Co.*, 167 F.3d 933 (5th Cir. 1999) .......................................... 17

*Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277 (5th
    Cir. 1985) .................................................................................................... 15, 16

*In re Fuller*, 581 B.R. 236 (W.D. Mich. 2018) ................................................................ 21

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) .................. 2

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831
    (5th Cir. 1993) .............................................................................................. 20

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) .................................... 19

*Lord v. Veazie*, 49 U.S. 251 (1850) ................................................................................ 11

*Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916 (5th Cir. 2017) ........................................................................................................... 11, 12

*Martinez v. Regents of Univ. of California*, 241 P.3d 855 (Cal. 2010) .................................. 22, 23

*McGillivray v. Countrywide Home Loans, Inc.*, 360 F. App'x 533 (5th Cir. 2010) ...................... 3

*McLindon v. Russell,* No. CIV. A. C-1-95-676, 2000 WL 1221816 (S.D. Ohio Feb. 28, 2000) ............................................................................................................. 15

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971) ........................................... 11

*Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950) ........................................................ 13, 14

*Muskrat v. United States*, 219 U.S. 346 (1911) .......................................................................... 11

*Pool v. City of Houston*, 87 F.4th 733 (5th Cir. 2023) ............................................................. 1, 12

*Recreational Prop. Inc. v. Southwest Mortgage Serv. Corp.*, 804 F.2d 311 (5th Cir.1986) ............................................................................................................... 2, 14

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981) ...................................................... 11

*Simon v. E. Ky. Welfare Rights Organization*, 426 U.S. 26 (1976) ............................................... 2

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................................. 11

*Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004) ......................................................... 20

*Terrazas v. Clements* ............................................................................................................. 13, 14

*Thompson v. Am. Home Assur. Co.,* 95 F.3d 429 (6th Cir. 1996) ............................................... 15

*United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) ................................................ 13, 14

*United States v. Johnson*, 319 U.S. 302 (1943) ............................................................................. 1

*United States v. Windsor*, 570 U.S. 744 (2013) .......................................................................... 21

*Volunteer Energy Servs., Inc. v. Option Energy, LLC*, Fed. App'x 319 (6th Cir. 2014) .............. 21

*Williams v. New Orleans Pub. Serv., Inc.*, 728 F.2d 730 (5th Cir. 1984) .................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................................... 22, 23

**Constitutional Provisions & Statutes**

U.S. Const. Art. III, § 2 ............................................................................................................. 11

**Rules & Regulations**

Fed. R. Civ. P. 60 .................................................................................................................... 2, 15

Fed. R. Civ. P. 59(e) ............................................................................................................... 3, 20

FED. R. CIV. P. 60(b) ............................................................................................ passim

FED. R. CIV. P. 60(b)(1) .............................................................................. 11, 15, 17, 18

FED. R. CIV. P. 60(b)(4) ............................................................................................ 11, 14

FED. R. CIV. P. 60(b)(6) ............................................................................................ 3, 18

**Other Authorities**

MOORE'S FEDERAL PRACTICE § 60.48[3][b], p. 60–188 (3d ed. 2024) ....................................... 19

Tex. Ed. Code § 54.052(a)(3) ...................................................................................... 4, 22

Tex. Ed. Code § 54.051(m) ............................................................................................ 4

Tex. Ed. Code § 54.052 (a) ............................................................................................ 4

# I.    <u>INTRODUCTION</u>

Proposed Intervenors[1] respectfully request, on an emergency basis, that the Court vacate its June 4, 2025 Order and Final Judgment (the "Consent Order"). Dkt. 8. The Consent Order declared the Texas Dream Act (or "Dream Act") unconstitutional, based only on an agreement between the two initial parties, the United States and Texas (the "Parties"). Dkt. 6. The stakes are high. Setting aside the policy merits of the Dream Act, the avenues of opportunity it opened for children who know only Texas as home, and the imminent harm to their college aspirations, the Federal Courts are not conduits for the executive branches' political agendas. The founders did not design our adversarial system for shadowboxing between co-parties. The system demands opposition, argument, and deliberation—not consent decrees masquerading as litigation.

A number of grounds under Rule 60(b) and Rule 59(e) warrant vacatur of the Consent Order. ***First***, the Consent Order is void under Rule 60(b)(4) for lack of subject matter jurisdiction and denial of due process. The Parties' conduct deprived the Court of subject matter jurisdiction from the start. "Such a suit is collusive because it is not in any real sense adversary. It does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court." *United States v. Johnson*, 319 U.S. 302, 305 (1943) (internal quotations omitted); *see also Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023) ("It is well settled that, where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy."). And "[t]he validity of an order of a

---

[1] Concurrently with this Motion, Proposed Intervenors have filed an Emergency Motion to Intervene. Due to the urgent nature of these requests, Proposed Intervenors understand that the Court must decide, in the first instance, whether Proposed Intervenors may raise their challenges to this Court.

federal court depends upon that court's having jurisdiction over both the subject matter and the parties." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006) (quoting *Simon v. E. Ky. Welfare Rights Organization*, 426 U.S. 26, 37 (1976)).

Plaintiff United States and Defendant State of Texas ignored these authorities when they hastily asked this Court to bar "enforcement" of the Dream Act—immediately impacting the lives of Proposed Intervenors, La Unión del Pueblo Entero's ("LUPE") members, over 57,000 Texas students, and every public higher education institution in Texas. The United States and Texas did not present this Court with a dispute regarding the constitutionality of that twenty-four-year-old law. Instead, they colluded to secure an agreed injunction. Further, such a "one-sided determination" of the constitutionality of state legislation—without notice yet decisive of the educational right of hundreds of thousands of impacted students—violates due process. *Goss v. Lopez*, 419 U.S. 565, 580 (1975). The Consent Order is void. *See Recreational Prop. Inc. v. Southwest Mortgage Serv. Corp.*, 804 F.2d 311, 313 (5th Cir.1986) (the court "has no discretion— the judgment is either void or it is not."); *see also Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289, 298 (5th Cir. 2015) (A judgment is void when the rendering court "lacked jurisdiction of the subject matter or . . . [when] it acted in a manner inconsistent with due process of law.").

***Second***, Rule 60(b)(1), which permits relief when a litigant shows faultless "surprise," also warrants vacatur. Rule 60(b)(1) provides for relief from judgment on the grounds of "mistake, inadvertence, surprise, or excusable neglect." FED. R. CIV. P. 60. The "surprise" to Proposed

Intervenors was not a fleeting reaction; it is a profound disruption to their lives, mission, and operations, just two days after the Dream Act survived repeal efforts in the state legislature.

*Third*, the sort of "extraordinary circumstances" that Rule 60(b)(6)'s "catchall provision" protects against, *see Buck v. Davis*, 580 U.S. 100, 112 (2017), surely exist here. The timing of the action mere days after the Texas Legislature declined to repeal the law; the speed of Texas's agreement with the United States immediately after filing; the absence of any defense by the Attorney General of a decades-old state law; and the widespread implications for Proposed Intervenors—the higher education aspirations of thousands of Texas students—are truly extraordinary.

*Fourth*, as a separate and additional basis for relief, Rule 59(e) authorizes a Court to vacate its judgments. *See Foman v. Davis*, 371 U.S. 178 (1962); *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993). Rule 59(e) motions can correct a clear error of law or prevent manifest injustice of the sort present here. *McGillivray v. Countrywide Home Loans, Inc.*, 360 F. App'x 533, 537 (5th Cir. 2010).

For the reasons explained below, the Court should grant relief under Rule 60(b) or, in the alternative, Rule 59(e). Proposed Intervenors further request that the Court require expedited briefing of these issues, so that Proposed Intervenors may have the ability to appeal, if necessary, prior to the fall tuition deadlines.

## II.    BACKGROUND

### A.  The Texas Dream Act Expands Education in Texas.

On June 16, 2001, Governor Rick Perry signed House Bill 1403, also known as the Texas Dream Act, a landmark law passed by the Texas Legislature with overwhelming bipartisan support. This law made Texas the first state in the country to allow eligible students to pay in-state

tuition at public colleges and universities, regardless of their immigration status. Since its passage, twenty-five other states have passed similar laws and followed in Texas's footsteps.[2]

The Texas Education Code provides multiple avenues for students to qualify for in-state tuition. *See e.g.,* Tex. Ed. Code §§ 54.051(m); 54.052(a). Section 54.052(a), for example, sets out three standards under which a person can qualify for in-state tuition. The subsection known as the Dream Act, Section 54.052(a)(3), makes eligible a student who: 1) graduated from a Texas high school, 2) maintained a residence in Texas for the three years prior to graduating from high school, and 3) maintained a residence in Texas for the year preceding enrollment in college. *Id.* § 54.052(a)(3). To establish entitlement to in-state tuition under 54.052(a)(3), a person who "is not a citizen or permanent resident of the United States" must submit an "affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible." *Id.* § 54.053(3)(B).

The Texas Dream Act has paved the way to education for tens of thousands of Texas students who would otherwise have been unable to attend college or university solely because of the cost. Because of this law, a generation of Texas students has been able to earn undergraduate and graduate degrees and enter the workforce in their home state of Texas. Out-of-state tuition rates are typically "three times higher than in-state rates,"[3] so the Dream Act can make all the difference. For instance, at The University of Texas Rio Grande Valley, the 2024-2025 undergraduate in-state tuition and fees for a full-time student living off campus were estimated at

---

[2] App. 5 (Chelsie Kramer, *Texas Dream Act: Protecting Undocumented Students' Access to Higher Education is Economic, Educational Imperative*, Immigr. Impact (Mar. 4, 2025), https://immigrationimpact.com/2025/03/04/texas-dream-act-undocumented-students-higher-education/#:~:text=As%20of%20the%20most%20recent%20data%2C%20approximately,Texas'%20workforce.%20The%20Economic%20Consequences%20of%20Repeal.    [hereinafter "Immigration Impact"].)

[3] *Id.*

$9,986 per semester but was as high as $22,286 at the out-of-state rate.[4] This significant cost difference is enough to deter individuals, like the members of Proposed Intervenors, from pursuing higher education entirely.

The Dream Act has also benefitted the schools these students attend and the State as a whole. Dream Act students create significant tuition revenue for State institutions—a net revenue benefit of $71 million, per a 2021 estimate.[5] Without the Dream Act, a substantial portion of these students will be forced to forgo their education, and schools across Texas will lose tens of millions of dollars in funding. And with the loss of these educational opportunities, state and local governments will stand to lose millions in tax revenue.[6]

### B. The Texas Legislature Refuses to Repeal the Dream Act for Twenty-Four Years.

For more than two decades, the Texas Dream Act has received strong bipartisan support. But that support has not been without considerable ongoing public debate. In 2015, for example, a repeal effort received significant attention, attracting prominent voices on both sides.[7] Ultimately, the repeal bill failed to even make it to a vote on the Senate floor.[8]

In 2025, in the 89th Legislative Session, opponents filed at least nine bills to repeal or restrict the Texas Dream Act.[9] One of the most prominent, HB 232, advanced to a public hearing

---

[4] App. 14 (*Cost of Attendance*, Univ. of Tex. Rio Grande Valley, https://www.utrgv.edu/ucentral/paying-for-college/cost-of-attendance/index.htm (accessed June 12, 2025)).

[5] App. 102 (*Texas Dream Act Report*, Every Texan (May 2023), https://everytexan.org/wp-content/uploads/2023/05/Texas-Dream-Act-fact-sheet-May2023.pdf.).

[6] *Id.* (estimating a tax benefit to state and local governments of $43 million in 2021 alone from Dream Act students).

[7] App. 20 (Texas State Historical Association, *Understanding the Texas Dream Act: House Bill 1403*, Aug. 23, 2016, available at https://www.tshaonline.org.).

[8] *Id.*

[9] App. 25 (Chelsie Kramer, *Texas Dream Survives—Because Texans Showed Up,* Immigr. Impact (May 30, 2025), available at www.immigrationimpact.com.).

in House Committee on Higher Education, but no further. Opposition was too strong: 97% of public comments opposed HB 232.[10]

On June 2, 2025, when Texas's legislative session ended, and in accordance with the legislative process, the Texas Dream Act was still standing.

### C.  The United States and The State of Texas Collude to Take Down the Dream Act.

On June 4, 2025, the United States filed a complaint in the Wichita Falls Division of the United States District Court for the Northern District of Texas. Dkt. 1. According to the Complaint, "Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because a substantial portion of the events occurred in the district." Dkt. 1 (¶ 2). The Complaint did not identify what "events" occurred in Wichita Falls.

Almost immediately after the filing, an attorney entered an appearance on behalf of Texas, Dkt. 3, and Texas waived service. Dkt. 5. Within hours, the United States and Texas filed a three-page Joint Motion for Entry of Consent Judgment, appending a proposed "Order and Final Judgment." Dkt. 6, 6-1. In the Joint Motion, "the Parties agree[d]" on jurisdiction, venue, that "the Court has the authority to provide the requested relief," that federal law "expressly preempts" the Dream Act, and to bear their own costs and fees. Dkt. 6 ¶¶ 2, 5, 8, 11.

This sequence of events compels one conclusion: the United States and the Texas Attorney General colluded to predetermine the outcome of the case. Such procedural velocity in a constitutional lawsuit is extraordinary. Attorneys do not "immediately" waive service in major constitutional litigation without weeks of intergovernmental negotiation. Nor do they produce a joint stipulation conceding every legal issue—especially preemption—within hours and without analysis, briefing, or dissent. This was not an adversarial case; it was legal choreography.

---

[10] *Id.*

### D.  The Consent Order Risks Imminent Harm to Intervenors and Across Texas.

The Final Judgment has concrete and imminent effects on Proposed Intervenors.

Proposed Intervenor La Unión del Pueblo Entero ("LUPE") was founded in 1989 by labor rights

activists César Chávez and Dolores Huerta and established in 2003 in the Rio Grande Valley.[11]

LUPE advances the objectives of low-income communities through a community organizing

model.[12] It provides its members free or low-cost community services, English classes, and higher

education resources for college student members.[13] LUPE has approximately 8,000 members who

receive access to LUPE's services.[14]

Education Access is a top priority for LUPE.[15] LUPE provides both direct and indirect

assistance in accessing higher education to undocumented students and students with Deferred

Action for Childhood Arrivals ("DACA").[16] For example, from 2020-2024, LUPE staff provided

individual consultations for an annual cohort of undocumented members who wanted to attend

college.[17] Staff also conducts trainings for local high school counselors to ensure all students,

regardless of citizenship, have the information they need to access higher education,[18] and creates

extensive written materials to educate the community about college access for undocumented

students, including its ¡*Al Colegio Si Se Puede!* Undocumented Student Guide.[19]

---

[11] App. 110 (Ex. 11, Decl. of Tania Chavez ¶ 3).
[12] *Id.*
[13] App. 111, 113-14 (¶¶ 6–7, 13–16).
[14] App. 111 (¶ 5).
[15] App. 113 (¶ 13).
[16] App. 113–114 (¶¶ 14–17).
[17] App. 114 (¶ 16).
[18] App. 115 (¶ 15).
[19] App. 114 (¶¶ 16–17); *see also* App. 36 (La Unión del Pueblo Entero, ¡*Al colegio Si Se Puede!: Undocumented Student Guide* (2024), available at https://lupenet.org/wp-content/uploads/2024/08/al-colegio-si-se-puede-guide-56-pages.pdf.).

The Consent Order has already affected LUPE's work significantly—from its staffing, outreach, and advocacy to the preparation of its social media and print materials, to its community relationships. LUPE's staff has had to redirect its efforts to both communicating with the affected students and families[20] and to understanding, through higher education institutions and their governing bodies, how to guide affected students through this abrupt change. LUPE has had to reinvent its community outreach and advocacy efforts in light of the disappearance of an established path to higher education for its college-ready members, disrupting long-established programs and services.[21] LUPE's social media has similarly had to adjust, especially LUPE Youth, a social media account aimed at providing information to community members under age twenty-five.[22] LUPE's print materials—on which it regularly spends significant resources—became outdated and irrelevant overnight. And it has had to reorient its community relationships, with universities, schools, and community colleges, for example, to focus exclusively on responding to this significant disruption and away from other important initiatives.[23]

Of course, the most direct harm has been to LUPE's members themselves—those planning for college, and those enrolled in higher education institutions at the time of the Consent Order, whose tuition effectively tripled.[24] The injury is not, unfortunately, redressable through a monetary remedy such as a refund of overpaid tuition, because many if not most LUPE members lack the resources to pay out-of-state tuition in the first place.[25] As a result, many of LUPE's affected members will be forced to suspend their studies.[26]

---

[20] App. 110 (Decl. of Tania Chavez ¶ 19).
[21] App. 114-15 (¶ 18).
[22] App. 115 (¶ 19).
[23] App. 114-17 (¶¶ 18–24).
[24] App. 117 (¶¶ 25–27).
[25] *Id*. (¶ 27).
[26] *Id*.

Proposed Intervenor Austin Community College is a nationally recognized public institution of higher education serving the Austin, Texas metropolitan area and surrounding Central Texas communities.[27] ACC's mission is to provide open access to high-quality education and training, support student success, and serve as a catalyst for economic development and community enrichment.[28]

As ACC Chancellor Dr. Russell Lowery-Hart explains, the Consent Order impacts ACC's revenues, enrollment, prospective students, reputation, administrative processes, marketing, recruitment, public relations, scholarships, fundraising, campus life, academic programs, and student support services. ACC's funding is derived from a combination of sources, including tuition and fee payments from enrolled students.[29] ACC estimates that approximately 440 of its students will now face a four-fold tuition increase, which in turn is expected to lead to the withdrawal of hundreds of students.[30] The tuition increase will also deter prospective students, reducing the pool of qualified applicants from Texas high schools.[31] This all leads to revenue loss, and any loss of revenue can impact ACC's academic programs, student support services, and campus operations.[32]

The administrative burdens are also meaningful. ACC may have to create new administrative processes to determine which students are no longer eligible for in-state tuition, notify them, recalculate their tuition bills, and manage appeals or requests for reconsideration.[33] The abrupt change also undermines ACC's efforts to market itself as an accessible, inclusive, and

---

[27] App. 140 (Ex. 16, Decl. of Russell Lowery-Hart ¶ 2).
[28] *Id.*
[29] *Id.* (¶ 3).
[30] App. 141 (¶ 5a).
[31] *Id.* (¶ 5b).
[32] *Id.*
[33] App. 142 (¶ 5d).

affordable institution for all Texas high school graduates, triggering public relations, marketing, and recruitment costs. And the demand for scholarships will rise, placing greater burden on existing resources.[34] As Dr. Lowery-Hart explains, "the loss of these students will have a cascading effect on campus life, academic programs, and student support services".[35]

Proposed Intervenor Oscar Silva is a 24-year-old student who has lived in Texas since he was one.[36] He grew up in Garland, where he graduated from elementary, middle, and high school, before moving to Denton, Texas, his current home.[37] Silva is now a student at the University of North Texas ("UNT") in a joint bachelor's and master's program, and is on track to graduate in Spring 2026 with a B.S. in Economics and a B.S. and M.S. in Accounting.[38]

Silva can attend UNT thanks to the Texas Dream Act.[39] As a life-long Texan and Texas high school graduate, he has been eligible—by meeting the statutory criteria and signing the required affidavit—for in-state tuition.[40] This tuition benefit, plus individual one-time merit-based scholarships and financial aid he has earned, made his education possible.[41]

Silva's graduation next spring hinges on his continued eligibility for in-state tuition; without it, he may be forced to withdraw from school.[42] Silva cannot afford to pay out-of-state tuition.[43] UNT has never classified him as an out-of-state student, and he has enrolled in the Fall Semester in reliance of the Dream Act's in-state tuition.[44]

---

[34] *Id.* (¶ 5f).
[35] *Id.* (¶ 6).
[36] App. 136 (Ex. 15, Decl. of Oscar Silva ¶ 2).
[37] *Id.*
[38] *Id.* (¶ 3).
[39] *Id.* (¶ 5).
[40] *Id.*
[41] App. 136-37 (¶¶ 6, 8–9).
[42] App. 137 (¶ 14).
[43] *Id.*
[44] App. 136 (¶ 5).

### III.    ARGUMENT

**A.  The Court Should Vacate the Consent Order Pursuant to Rule 60(b).**

Rule 60(b) allows a court to vacate a judgment "to do substantial justice." *Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998); *cf. Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981) (noting, in the context of default judgments, that "[t]runcated proceedings are not favored and Rule 60(b) will be liberally construed in favor of trial on the full merits of the case."). Here, Rule 60(b)(4), (b)(1), and (b)(6) each offer independent grounds for such relief.

**1.  *Rule 60(b)(4) Warrants Relief Based Upon Lack of Subject Matter Jurisdiction and Due Process.***

Rule 60(b)(4) requires vacatur of a judgment void due to the absence of subject matter jurisdiction. FED. R. CIV. P. 60(b)(4). A judgment is void when the court that rendered it "lacked jurisdiction of the subject matter, or of the parties, or [when] it acted in a manner inconsistent with due process of law." *Brumfield*, 806 F.3d at 298 (quoting *Williams v. New Orleans Pub. Serv., Inc.*, 728 F.2d 730, 735 (5th Cir. 1984)). For a federal court to possess subject matter jurisdiction over a suit, the matter must meet Article III's "case or controversy" requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); U.S. Const. Art. III, § 2; *see also Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017) ("Because there was no Article III case or controversy at the time the district court entered judgment in the case, the court's judgment is void for lack of subject matter jurisdiction and is vacated.").

When "both litigants desire precisely the same result," there is no Article III case or controversy. *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971); *see also Muskrat v. United States*, 219 U.S. 346, 361–62 (1911); *Lord v. Veazie*, 49 U.S. 251, 255 (1850). The Fifth Circuit has consistently applied this principle, holding that federal courts lack jurisdiction where "all parties have agreed from the beginning of this case that [the challenged]

statutory provision [is] unconstitutional," *Pool*, 87 F.4th at 733–34, or where both parties "affirmatively desire the same result," *Bullard v. Estelle*, 708 F.2d 1020, 1023 (5th Cir. 1983) (citations omitted).

The sequence of events on June 4, 2025 compels the conclusion that no case or controversy was present. The United States and Texas's Joint Motion admits that "the Parties agree" on jurisdiction, venue, that "the Court has the authority to provide the requested relief," and that federal law "expressly preempts" the Texas Dream Act. Dkt. 6 ¶¶ 2, 5, 8. At no point did Texas dispute a single factual or legal allegation, assert any defense, or seek any relief other than the exact declaratory and injunctive relief requested by the United States. Indeed, the rapid-fire filings would likely have been impossible to achieve without a pre-existing agreement between the Parties. In hastily agreeing to a consent decree, Texas and the United States deprived this Court of the full benefit of the judicial process, including oral argument and briefing on the merits.

The Texas Attorney General did not merely decline to oppose the United States's requested relief here; he moved jointly for it. The proceeding was therefore collusive and non-adversarial, leaving this Court without subject matter jurisdiction to adjudicate it.[45] Vacatur is warranted. *See Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017) ("Because there was no Article III case or controversy at the time the district court entered

---

[45] Such collusive suits have been resoundingly criticized by federal officials. *See* U.S. Environmental Protection Agency, *Adhering to the Fundamental Principles of Due Process, Rule of Law, and Cooperative Federalism in Consent Decrees and Settlement Agreements* (Oct. 16, 2017), https://archive.epa.gov/epa/sites/production/files/2017-10/documents/signed_memorandum_in_support_of_consent_decree_and_settlement_agreement_oct162017.pdf (Trump agency memorandum critiquing the "sue and settle" tactic used by the Obama administration, stating "The days of this regulation through litigation are terminated.").

judgment in the case, the court's judgment is void for lack of subject matter jurisdiction and is vacated.").

Rule 60(b)(4) requires vacatur for an additional reason: the Parties secured a consent decree in a manner inconsistent with due process. *F.D.I.C. v. SLE, Inc.*, 722 F.3d 264, 270 (5th Cir. 2013); *Callon Petroleum Co. v. Frontier Ins. Co.,* 351 F.3d 204, 210 (5th Cir. 2003). The Supreme Court has long recognized that notice is an "elementary and fundamental" requirement of due process; it must be "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314 (1950). Moreover, the notice "must afford a reasonable time for those interested to make their appearance." *Id*. The Supreme Court has further emphasized that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Even temporary deprivations of protected interests require advance notice of the charges and "some kind of hearing," because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Goss v. Lopez*, 419 U.S. 565, 580 (1975).

These foundational protections apply with particular force where a court's decree purports to bind individuals who never consented to it. In a concurring opinion, Fifth Circuit Judge Rubin—joined by four other Circuit Judges—explained that a district court must do far more than offer "perfunctory approval" of a consent judgment. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring). Instead, the court must determine, based on an evidentiary record, that the decree is "fair, adequate and reasonable," and that it "does not put the court's sanction on…a decree that violates Constitution, statute, or jurisprudence," especially "[i]f the decree also affects third parties." *Id.* The court in *Terrazas v. Clements* reiterated this obligation,

holding that a reapportionment consent decree could be approved only after the court verified its fairness, adequacy, and reasonableness "as to . . . affected third parties" through findings grounded in evidence, affidavit, or stipulation. 581 F. Supp. 1319, 1322–23 (N.D. Tex. 1983).

Here the United States and Texas lodged a proposed decree and secured its entry the same day—without any notice to the students whose interests the Consent Order affects, and without any hearing, evidentiary showing, or opportunity for response or opposition. The Consent Order thus exhibits precisely the laws the Supreme Court and Fifth Circuit have repeatedly condemned: it adjudicates and permanently restructures third-party rights through "secret, one-sided" proceedings that lack the most basic elements of due process. *See Mullane*, 339 U.S. at 314; *Goss*, 419 U.S. at 580; *Miami*, 664 F.2d at 441.

The Consent Order exemplifies the dangers that the Constitution, the Supreme Court, and Fifth Circuit precedents guard against: a decree that resolves no real dispute, renders an advisory opinion on the constitutionality of state law bypassing the legislative branch, and impacts absent third parties without the safeguards of adversarial litigation. Under Rule 60(b)(4), the court "has no discretion—the judgment is either void or it is not." *Recreational Prop. Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 313 (5th Cir.1986). Here, it is void.

Moreover, vacating the judgment would restore the parties—and Proposed Intervenors— to the two-decade-long status quo, allowing any legitimate constitutional or preemption disputes to proceed in a court with proper subject-matter jurisdiction. The United States would remain free to pursue its case against Texas and Proposed Intervenors.

For these reasons, the Court should grant this Motion and vacate the June 4, 2025 Judgment under Rule 60(b)(4).

##### 2.    *Rule 60(b)(1) Warrants Relief Based Upon Surprise to Intervenors.*

In the alternative, Proposed Intervenors are also entitled to relief under Federal Rule of Civil Procedure 60(b)(1) on the basis of surprise. Rule 60(b)(1) provides for relief from judgment on the grounds of "mistake, inadvertence, surprise, or excusable neglect." FED. R. CIV. P. 60. The term "surprise" in the Rule 60(b)(1) context is not defined by statute and is therefore given its plain meaning. *See Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 312 (N.D. Tex. 2004) ("Those cases the Court found do not engage in any analysis of 'surprise,' but simply apply the ordinary meaning of the word to their facts.").

"Surprise" is defined as "an unexpected occurrence or event; anything unexpected or astonishing." *Id.* at 313 n.7 (quoting OXFORD ENGLISH DICTIONARY ONLINE (2d ed. 1989)). Examples of surprise in the Rule 60(b)(1) context arise, for example, when parties do not receive copies of pleadings (*see, e.g.*, *McLindon v. Russell,* No. CIV. A. C-1-95-676, 2000 WL 1221816, at *1–2 (S.D. Ohio Feb. 28, 2000)) and when parties or intervenors do not receive actual notice of suit prior to the entry of default (*see, e.g.*, *Garcia,* 223 F.R.D. at 312; *Thompson v. Am. Home Assur. Co.,* 95 F.3d 429, 433 (6th Cir. 1996)).

A 60(b)(1) motion requires a court to consider "(1) the extent of prejudice to the [opposing party]; (2) the merits of the [moving party's] asserted defense; and (3) the culpability of [the moving party's] conduct." *Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1280 (5th Cir. 1985). Courts have set aside judgments under this provision where impacted parties' discovery of a judgment affecting them "surely was a surprise." *Bituminous Cas. Corp.*, 223 F.R.D. at 313 (quotation omitted)*.*

In *Garcia*, Chief Judge Godbey considered a Rule 60(b)(1) motion brought by intervenors in an insurance coverage dispute. *Id.* at 309. The insurer obtained a default judgment of no duty to

defend or indemnify the defendant, who was in prison and did not respond to service, and did not notify the intervenors. When the intervenors learned of the default judgment, they moved to intervene and set aside the judgment under Rule 60(b). *Id.* The 60(b)(1) inquiry turned on two considerations: first, whether there was a "surprise," and second, whether equitable considerations supported vacating the judgment. *Id.* at 313.

The court determined that equity demanded vacatur. Reviewing the *Hibernia* factors, the court noted the challenged judgment was entered "without any notice to Intervenors, without any negligence or carelessness by Intervenors, not as a result of any ignorance of the law on the part of Intervenors or their attorneys, [and] was not a result of an intentional choice by Intervenors." *Id.* The intervenors were "significantly prejudiced" because of the limitation on their "ability to recover insurance proceeds," whereas the insurer would face "minimal" prejudice "because it [would] simply be required to prove its case on the merits in an adversarial forum, rather than obtaining a windfall judgment by forfeit." *Id.* Finally, the motion was timely, filed within one year of the judgment. The intervenors were thus entitled to relief on the ground of surprise.

Here too, it is indisputable that the Consent Order was a "surprise" to Proposed Intervenors. "In a plain meaning sense," Proposed Intervenors were not apprised of the Parties' plans or given the opportunity to oppose the Consent Order. *See Garcia*, 223 F.R.D. at 313. Proposed Intervenors had no warning of the United States's Complaint, nor the Parties' joint motion, nor the entry of Judgment. Indeed, it would be an understatement to say that the Consent Order surprised Proposed Intervenors. Proposed Intervenors and their members, along with tens of thousands of beneficiaries of the Texas Dream Act, had just days earlier been assured of the defeat of repeal efforts. It will be two years before the Legislature will convene again and even have an opportunity to revisit the law. Even if the United States had merely filed a complaint, there should have been time to answer,

brief, and potentially try a case. Not so here. The Parties sought final judgment immediately, purporting to abandon state law and leaving the Court without the full benefit of the adversarial process.

Moreover, Proposed Intervenors stand to suffer irreparable harm as a result of this rushed action, about which they had no foreknowledge, and in which they had no opportunity to participate—through no fault of their own. Proposed Intervenors LUPE's mission and operation includes supporting higher education for undocumented Texas students.[46] The Consent Order frustrates how LUPE fulfills that mission. The Consent Order constitutes a material inflection point for LUPE, with systemic and enduring implications.[47] On the other hand, any prejudice to the parties is slight, as they would merely be required to engage in the ordinary course of litigation and "prove [the] case on the merits in an adversarial forum," in a case that they voluntarily commenced. *Garcia*, 223 F.R.D. at 313 ("Courts construe Rule 60(b)(1) liberally to ensure that they resolve doubtful cases on the merits.") (quoting *Rogers v. Hartford Life and Acc. Ins. Co.*, 167 F.3d 933, 938–39 (5th Cir. 1999)).

Similarly, Austin Community College faces impending harm as a result of the Consent Order. As detailed above, the Consent Order impacts ACC's revenues, enrollment, prospective students, reputation, administrative processes, marketing, recruitment, public relations, scholarships, fundraising, campus life, academic programs, and student support services. ACC anticipates revenue loss, and any loss of revenue can impact ACC's academic programs, student support services, and campus operations.[48] ACC also expects administrative burdens, as it may

---

[46] App. 110 (Ex. 11, Decl. of Tania Chavez ¶¶ 13 –17).
[47] *See id.* (¶¶ 18–29).
[48] App. 141 (Ex. 16, Decl. of Lowery-Hart Dec ¶ 5a).

need to create new processes and systems, change its marketing and public relations efforts, and adjust to higher demand for scholarships.[49]

The Consent Order also threatens Silva's access to higher education. Since enrolling at UNT, he has depended on eligibility for in-state tuition.[50] He is enrolled for classes this fall, and his fall semester tuition is due in early August.[51] Without eligibility for in-state tuition, Silva will not be able to afford to finish his education.[52]

Proposed Intervenors have acted expeditiously in bringing their motion under this provision, engaging in no conduct that would counsel against relief. Rule 60(b)(1)'s "surprise" element is met here, and the Court should grant Proposed Intervenors' requested relief.

### 3.     *Alternatively, Extraordinary Circumstances Justify Relief Under Rule 60(b)(6).*

In the alternative, relief is warranted under Federal Rule of Civil Procedure 60(b)(6), given the extraordinary circumstances arising from Texas and the United States colluding to avoid the legislative and judicial process and overturning law by fiat. Rule 60(b)(6) provides for vacatur for "any other reason that justifies relief." FED. R. CIV. P. 60. Rule 60(b)(6) serves as a "catchall" provision when relief is warranted yet does not fit within one of the other provisions of Rule 60(b). *See Buck*, 580 U.S. at 112; *see also Garcia*, 223 F.R.D. at 313 ("[T]he Court believes that Intervenors would be entitled to relief under Rule 60(b)(6) if Rule 60(b)(1) were inapplicable.").

Relief under Rule 60(b)(6) requires "extraordinary circumstances." *See id.* Parties invoking the Rule must typically be "faultless," with the movant "completely without fault for his or her predicament." *Id.* at 1621 (quoting 12 J. Moore, D. Coquillette, G. Joseph, G. Vairo, & C. Varner,

---

[49] App. 141-24 (¶ 5b-f).
[50] App. 136 (Ex. 15, Decl. of Oscar Silva ¶¶ 8–9).
[51] *Id.* (¶ 12).
[52] *Id.* (¶ 14).

MOORE'S FEDERAL PRACTICE § 60.48[3][b], p. 60–188 (3d ed. 2024)). Rule 60(b)(6) relief is available "provided that the motion is made within a reasonable time and is not premised on one of the [other] grounds for relief . . . whenever such action is appropriate to accomplish justice[.]" *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). In considering such a motion, courts look to "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* ("We must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice.") (quotations omitted).

Here, even if the Court does not find relief warranted under the other provisions of Rule 60(b), extraordinary circumstances beg for vacatur. Proposed Intervenors have acted within a reasonable time, less than twenty days since the entry of the Consent Order, to ask the Court to vacate its judgment. Further, denial of vacatur in this case will cause substantial injustice to Proposed Intervenors and thousands of other Texas students based on the invalidation of the Texas Dream Act through a collusive agreement that contradicted the will of the Texas Legislature.

The sequence of events at issue is so remarkable, and the implications so far reaching, that there is a serious risk of lasting damage to the public's confidence in the judicial process. The public rightfully expects the judiciary to adjudicate real disputes. Instead, the Parties here collusively enjoined a decades-old law in a matter of hours, depriving the Court of the opportunity to decide the issues. It is plain that the Parties sought to use the judiciary to accomplish their preferred end, which they had days earlier been unable to accomplish through the democratic process. With the rights of thousands at stake, here, "justice must satisfy the appearance of justice." *Liljeberg*, 486 U.S. at 864.

Moreover, the Attorney General acted unilaterally to bind the State in a consent decree that flew in the face of the clear desires of the democratically elected legislative branch. As already noted, two days before the Attorney General voluntarily joined in the United States's attack on Texas Law, the Legislature refused to repeal the Dream Act. The Attorney General neglected his duties as an advocate of the people's laws when failing to defend the law as written by a separate and coequal branch of the State. "No lawyer may forge a settlement agreement over the express objection of his client." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 842 (5th Cir. 1993) ("The Attorney General acts as counsel for state officials who are his clients. . . . It does not follow that by doing so, the Attorney General steps into their shoes and assumes the[ir] policymaking roles."). At minimum, the issues raised in the United States's Complaint warrant merits-based briefing from parties willing to engage with the substance of the challenge. As such, Rule 60(b)(6) relief is warranted.

**B.  The Court Should Vacate the Consent Order Pursuant to Rule 59(e).**

Alternatively, the Court should vacate its Consent Order pursuant to Rule 59(e). *See Edward H. Bohlin Co., Inc.*, 6 F.3d at 355 (Rule 59(e) "cover[s] motions to vacate judgments, not just motions to modify or amend"). Rule 59(e) is "an extraordinary remedy" over which the Court has "considerable discretion." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). In evaluating these motions, courts must weigh "the need to bring litigation to an end" against "the need to render just decisions on the basis of all the facts." *Id.* Under this provision, a party may move to "alter or amend a judgment . . . no later than 28 days after the entry of the judgment." FED. R. CIV. P. 59(e).

A Rule 59(e) motion is appropriate to correct a manifest error of law. *Camp v. Putnam*, 807 F. App'x 303, 305 (5th Cir. 2020). Here, as detailed above, *supra* Section III.A.1, legal errors

in the Consent Order necessitate vacatur. Specifically, the Parties' collusion nullified any case or controversy, depriving the Court of subject-matter jurisdiction and Proposed Intervenors of due process of law. *See In re S.L.E., Inc.*, 674 F.2d 359, 364 (5th Cir. 1982) ("Essential to the concept of a controversy, under Article III, is an on-going adversarial posture between the parties before the court."); *see also United States v. Windsor*, 570 U.S. 744, 780 (2013) (Scalia, J., dissenting) (courts are empowered to decide cases "only when that allegation will determine the outcome of a lawsuit, and is contradicted by the other party"). The lack of jurisdiction is a manifest error that the Court can and should correct by vacating the Consent Order.

Additionally, a court may grant a Rule 59(e) motion based on manifest injustice where "there exist[s] a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." *Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-CV-4295, 2012 WL 1952265, at *4 (S.D. Tex. May 30, 2012) (quotation omitted); *Gabarick v. Laurin Mar. (Am.) Inc.*, No. CIV.A. 08-4007, 2010 WL 5437391, at *5 (E.D. La. Dec. 23, 2010). "Manifest injustice" is an "amorphous concept" that requires "a 'want of equity' or some form of 'unfairness.'" *In re Fuller*, 581 B.R. 236, 243 (W.D. Mich. 2018) (quoting *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 331 (6th Cir. 2014)). The movant must demonstrate a likelihood of "change in the outcome in the movant's favor." *Id.* These conditions are met here in spades.

It would be manifestly unjust for the Consent Order to stand without the benefit of adversarial process and opportunity for thousands of affected Texans to be heard. Without reconsideration, thousands of students will lose the benefit of in-state tuition—meaning countless students will lose access to higher and post-secondary education altogether. They will be deprived of their access to education without any opportunity to defend the law on which they depend. The

Parties' insistence on undoing a decades-old law in a matter of hours was inherently unfair. And doing so without an opportunity for adversarial briefing is manifestly unjust.

Proposed Intervenors also demonstrate a likelihood of an outcome in their favor, both procedurally and substantively. Procedurally, the Consent Order should be vacated for all the reasons set forth herein. Substantively, if the United States wishes to enjoin the Texas Dream Act, it must demonstrate it has satisfied the well-established requirements for entry of an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction *must* satisfy a four-factor test before a court may grant such relief.") (emphasis added). It is doubtful that the United States could meet the requirements for any injunctive relief, much less demonstrate, as necessary for a preliminary or permanent injunction, imminent, irreparable harm resulting from a long-established law.

Moreover, on the merits, at least one state supreme court has rejected the statutory argument of the United States in a similar challenge to another state's version of this law. *Martinez v. Regents of Univ. of California*, 241 P.3d 855, 863 (Cal. 2010). There, the California Supreme Court ruled against plaintiffs, finding California's similar exemption from out-of-state tuition predicated on criteria beyond just residency was consistent with § 1623. Here too, the Texas Dream Act permits in-state tuition based on a set of criteria beyond mere residency. Section 54.052(a)(3) provides that a student can meet its exemption requirements by: 1) graduating from a Texas high school, 2) maintaining a residence in Texas for the three years prior to graduating from high school, and 3) maintaining a residence in Texas for the year preceding enrollment in a higher education institution. Tex. Ed. Code § 54.052(a)(3). Because the Dream Act's exemption is not based squarely on residency, it is not preempted by the federal statute.

At minimum, *Martinez* calls into question the United States's likelihood of success on the merits. An alternative statutory construction—and the assertion that § 1623 requires states to determine "lawful presence"—implicates severe constitutional concerns. Beyond the merits, the United States's ability to establish the other *Winter* factors is circumspect at best. Given these deficiencies, the United States would be hard-pressed to justify injunctive relief if confronted with adversarial process—satisfying Proposed Intervenors' burden to show a likelihood of change in the Consent Order in their favor.

Proposed Intervenors have demonstrated both manifest error of law and manifest injustice. Accordingly, the Court should vacate its Judgment under Rule 59(e).

### IV.    CONCLUSION

Given the urgency at stake—college enrollment decisions, approaching tuition assessment, and deposit deadlines at educational institutions across Texas—and to allow time for an appeal, if necessary, Proposed Intervenors request expedited consideration of their motions. The Texas Higher Education Coordinating Board, for example, instructed on June 18, 2025 that "each institution must assess the population of [affected] students," requiring immediate action by colleges.[53] Proposed Intervenors have reason to believe additional guidance could issue as soon as July 24, 2025. Accordingly, Proposed Intervenors respectfully request, to the extent possible, that the Court require any responses to this Motion and their Emergency Motion for Stay within one week; any replies within three days of any response; and a ruling by July 11, 2025.

---

[53] App. 108.

For the foregoing reasons, Proposed Intervenors respectfully request that the Court grant their Emergency Motion and vacate its June 4, 2025 Order and Final Judgment, as well as afford Proposed Intervenors any and all additional relief to which they may be entitled.

Dated: June 24, 2025                                    Respectfully submitted,

                                                        */s/ Andrés Correa*
                                                        Andrés Correa
                                                        Texas Bar No. 24076330
                                                        acorrea@lynnllp.com
                                                        Christopher Patton
                                                        Texas Bar No. 24083634
                                                        cpatton@lynnllp.com
                                                        Yaman Desai
                                                        Texas Bar No. 24101695
                                                        ydesai@lynnllp.com
                                                        Kyle A. Gardner
                                                        Texas State Bar No. 24116412
                                                        kgardner@lynnllp.com
                                                        Zhenmian Xu
                                                        Texas Bar No. 24135820
                                                        sxu@lynnllp.com
                                                        **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                                        2100 Ross Avenue, Suite 2700
                                                        Dallas, Texas 75201
                                                        (214) 981-3800 Telephone
                                                        (214) 981-3839 Facsimile

                                                        Kassandra Gonzalez*
                                                        Texas Bar No. 24116439
                                                        kassandra@texascivilrightsproject.org
                                                        Molly Petchenik
                                                        Texas Bar No. 24134321
                                                        molly@texascivilrightsproject.org
                                                        Daniel Woodward*
                                                        Texas Bar No. 24138347
                                                        danny@texascivilrightsproject.org
                                                        **TEXAS CIVIL RIGHTS PROJECT**
                                                        P.O. Box 17757
                                                        Austin, TX 78760
                                                        (512) 474-5073 ext. 182 Telephone
                                                        (512) 474-0726 Facsimile

Daniel Hatoum*
Texas Bar No. 24099136
daniel@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
(512) 474-5073 ext. 182 Telephone
(512) 474-0726 Facsimile

Efrén C. Olivares
Texas Bar No. 24065844
Federal Bar No. 1015826
olivares@nilc.org
Tanya Broder*
California Bar. No. 136141
broder@nilc.org
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20005-9997
(213) 674-2817 Telephone

David Donatti
Texas Bar No. 24097612
ddonatti@aclutx.org
Adriana Pinon
Texas Bar No. 24089768
apinon@aclutx.org
Edgar Saldivar
Texas Bar No. 24038188
esaldivar@aclutx.org
Sarah Corning*
Texas Bar No. 24144442
scorning@aclutx.org
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Joshua M. Salzman*
D.C. Bar No. 982239
jsalzman@democracyforward.org
Brian D. Netter*
D.C. Bar No. 979362
bnetter@democracyforward.org
Paul R.Q. Wolfson*
D.C. Bar No. 414759

pwolfson@democracyforward.org
Skye L. Perryman*
Texas Bar No. 24060411
sperryman@democracyforward.org
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PROPOSED INTERVENORS LA UNIÓN DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

## CERTIFICATE OF CONFERENCE

I certify that pursuant to LR 7.1, on June 23, 2025 the undersigned emailed counsel for the Parties asking whether they could agree to the relief requested herein. Counsel for the State of Texas is opposed. As of this filing, counsel for the United States have not responded.

/s/ Andrés Correa
*Andrés Correa*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

/s/ Andrés Correa
Andres Correa