# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# WICHITA FALLS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:25-cv-00055-O |
| | § | |
| STATE OF TEXAS, | § | |
| | § | |
| Defendant. | § | |

---

## EMERGENCY MOTION FOR STAY OF JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF OF PROPOSED DEFENDANT-INTERVENORS LA UNIÓN DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA

---

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     BACKGROUND ................................................................................. 3

        A.   The Texas Dream Act ............................................................. 3

        B.   Procedural History ................................................................. 4

III.    ARGUMENT ..................................................................................... 5

        A.   Proposed Intervenors Will Likely Succeed on the Merits of Their
             Motion to Vacate ................................................................... 6

             1.   *Proposed Intervenors are likely to succeed on their Rule
                  60(b)(4) claim.* .......................................................... 7

             2.   *In the alternative, Proposed Intervenors are likely to succeed
                  on their Rule 60(b)(1) claim.* ......................................... 10

             3.   *In the alternative, Proposed Intervenors are likely to succeed
                  on the merits of their Rule 60(b)(6) claim.* ....................... 11

             4.   *Alternatively, Proposed Intervenors are likely to succeed on
                  their Rule 59(e) claim.* ................................................. 13

        B.   Proposed Intervenors Will Likely Suffer Irreparable Harm in the
             Absence of a Stay ................................................................. 15

        C.   The Balance of Equities and Public Interest Favor a Stay ............ 20

IV.     CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Americans for Beneficiary Choice v. United States Dep't of Health & Hum. Servs.*,
No. 4:24-CV-00439-O, 2024 WL 3297527 (N.D. Tex. July 3, 2024) ........................... 21

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................... 9

*Arnold v. Garlock, Inc.*, 278 F.3d 426 (5th Cir. 2001) ................................................. 6

*Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-CV-4295, 2012 WL
1952265 (S.D. Tex. May 30, 2012) ............................................................................ 13

*Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308 (N.D. Tex. 2004) ................... 10, 11

*Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129 (5th Cir. 1979) ............................ 7

*Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289 (5th Cir. 2015) ................... 7

*Buck v. Davis*, 580 U.S. 100 (2017) ............................................................................ 11

*Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204 (5th Cir. 2003) ................... 9

*Camp v. Putnam*, 807 F. App'x 303 (5th Cir. 2020) ................................................... 13

*Carter v. Fenner*, 136 F.3d 1000 (5th Cir. 1998) ......................................................... 7

*Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358 (1978) .......................................... 20

*Drummond v. Fulton County Dep't of Family & Children's Serv.*, 532 F.2d 1001 (5th
Cir. 1976) ..................................................................................................................... 6

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .......................................... 14

*Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350 (5th Cir. 1993) ............................ 13

*F.D.I.C. v. SLE, Inc.*, 722 F.3d 264 (5th Cir. 2013) ..................................................... 8

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ........................................................................ 9

*Gabarick v. Laurin Mar. (Am.) Inc.*, No. CIV.A. 08-4007, 2010 WL 5437391 (E.D.
La. Dec. 23, 2010) ....................................................................................................... 13

*Goss v. Lopez*, 419 U.S. 565 (1975) ....................................................................... 9, 10

*Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277 (5th
Cir. 1985) ................................................................................................................... 10

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................................................... 6

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir. 1985) ................................. 15

*In re Fuller*, 581 B.R. 236 (W.D. Mich. 2018) ............................................................... 14

*Kemp v. United States*, 596 U.S. 528 (2022) ................................................................. 12

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ................................... 12, 13

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ......................................................... 20

*Martinez v. Regents of Univ. of California*, 241 P.3d 855 (Cal. 2010) .................................. 14, 15

*Matter of S. L. E. Inc.*, 674 F.2d 359 (5th Cir. 1982) ......................................................... 8

*Moore v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 47 (1971) ............................. 7, 8

*Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389 (5th Cir. 2013) ...................................... 6

*Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950) ................................................. 9, 10

*Muskrat v. United States*, 219 U.S. 346 (1911) ............................................................... 8

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) .............. 16, 21

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................... 5, 6, 21

*Pool v. City of Houston*, 87 F.4th 733 (5th Cir. 2023) ........................................................ 8

*Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. Unit A June 1981) .................................................... 6

*Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4 (1942) ......................................................... 21

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981) ................................................. 7

*Terrazas v. Clements,* 581 F. Supp. 1319 (N.D. Tex. 1983) .................................................. 9

*Texas v. United States Env't Prot. Agency*, 829 F.3d 405 (5th Cir. 2016) ................................. 16

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015) ........................................................ 16

*United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) ............................................ 9, 10

*Volunteer Energy Servs., Inc. v. Option Energy, LLC*, Fed. App'x 319 (6th Cir. 2014) ............. 14

*Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992) .................................. 6

*Williams v. New Orleans Pub. Serv., Inc.,* 728 F.2d 730 (5th Cir. 1984) ................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................ 14

*Young Conservatives of Texas Found. v. Univ. of N. Texas*, 609 F. Supp. 3d 504
    (E.D. Tex. 2022) ...................................................................................................................... 16

**Statutes**

Tex. Ed. Code § 54.051 .................................................................................................................. 3

Tex. Ed. Code § 54.052(a)(3) ...................................................................................................... 14

The Dream Act, Section 54.052 .................................................................................................... 3

**Other Authorities**

Fed. R. Civ. P. Rule 59(e) ...................................................................................................... 6, 12

Fed. R. Civ. P. Rule 60(b)(1) ............................................................................................ 6, 9, 10, 11

Fed. R. Civ. P. Rule 60(b)(4) ............................................................................................ 6, 7, 8, 9

Fed. R. Civ. P. Rule 60(b)(6) .................................................................................................. 6, 11

## I.    INTRODUCTION

On June 4, 2025, within hours of this suit being filed, the United States and Texas (the "Parties") jointly moved this Court to enter a judgment invalidating and enjoining the Texas Dream Act. Dkt. 6. That same day, without the benefit of adversarial briefing or argument, this Court entered its Order and Final Judgment (the "Consent Order"), issuing the requested injunction. Dkt. 8. Proposed Intervenors [1] respectfully request, on an emergency basis, that the Court stay its Consent Order.

The Consent Order purports to enjoin the State of Texas from enforcing the Texas Dream Act, a 24-year-old law, altering the status quo without notice to the Texas students, organizations, and educational institutions that rely on the Texas Dream Act to make higher education accessible. Proposed Intervenors La Unión del Pueblo Entero ("LUPE"), Austin Community College ("ACC"), and Oscar Silva (collectively, "Proposed Intervenors") face imminent, irreparable harm from the Consent Order. With fall tuition deadlines rapidly approaching, the tuition of thousands of students—including that of Proposed Intervenor Oscar Silva—has effectively tripled overnight. Proposed Intervenor LUPE has been inundated with calls and questions from members unsure of their paths forward, just as LUPE's education outreach, training, written materials and communications programs have become obsolete overnight. And higher education institutions, such as ACC, are scrambling in the face of anticipated changes in enrollment and revenues, administrative burdens, and disruptions to their admissions processes and systems.

---

[1] Concurrently with this Motion, Proposed Intervenors have filed an Emergency Motion to Intervene. Due to the urgent nature of these requests, Proposed Intervenors understand that the Court must decide, in the first instance, whether Proposed Intervenors may raise their challenges to this Court.

The State of Texas is harmed by the Consent Order, too. The State suffers from the intrusion on its sovereignty by a federal executive purporting to nullify a state law, intruding upon a quintessentially state function—determining the availability of in-state tuition. Texas also loses the opportunity to retain and educate individuals pursuing higher education and impacting the State's economy. But no one represented the interests of the State of Texas in this matter, with the Attorney General abdicating a public lawyer's duty to defend Texas law. The Parties together pursued a court order invalidating the Texas Dream Act, their quick and coordinated movements seemingly designed to avoid ordinary judicial scrutiny and public participation.

An injunction is an extraordinary remedy. Without even suggesting irreparable harm from the Texas Dream Act, the United States secured an injunction sweeping in its scope. The Consent Order shifts the ground beneath the feet of tens of thousands of students who must navigate the abrupt end of a quarter-century-old law that, just days prior to this suit, had survived legislative repeal efforts. Across Texas, institutions are scrambling to discern whether and how they are bound by a collusive agreement that was negotiated without their participation.

Proposed Intervenors respectfully request that this Court stay its Order and Final Judgment, including the injunction therein, pending final resolution of Proposed Intervenors' Emergency Motion for Relief from Judgment or, in the Alternative, to Alter or Amend Judgment (the "Motion to Vacate"). As the Motion to Vacate explains,[2] the appropriate remedy here is vacatur of the Consent Order under Rules 60(b) and 59(e). Given the imminent harm, to the extent the Court is not prepared to immediately vacate the Consent Order, Proposed Intervenors request a stay.

---

[2] Proposed Intervenors adopt by reference the arguments in the Motion to Vacate, to the extent not stated herein. *See* Fed. R. Civ. P. 10(c).

Due to the urgent impact on college enrollment decisions, approaching tuition assessment, and deposit deadlines at educational institutions across Texas, and to allow for appeal if necessary, Proposed Intervenors also respectfully request, to the extent possible, that the Court require any responses to this motion within one week, any replies within three days of any response, and a ruling by July 11, 2025.

## II.    BACKGROUND

### A.  The Texas Dream Act

Signed into law on June 16, 2001, House Bill 1403, also known as the Texas Dream Act (the "Dream Act"), has provided access to higher education for thousands of noncitizens across Texas. Texas became the first state in the nation to allow eligible students to pay in-state tuition at public universities and colleges, regardless of their immigration status.[3]

Under the Texas Education Code, individuals can qualify for in-state tuition if they meet certain criteria, none of which include immigration status. *See* Tex. Ed. Code §§ 54.051(m), 54.052(a). The Dream Act, Section 54.052(a)(3), allows for a student to qualify for in-state tuition if they: (1) graduated from a Texas high school; (2) maintained a residence in Texas for three years prior to graduating from high school; and (3) maintained a residence in Texas for the year preceding enrollment in a higher education institution. To qualify, a person who is not already a citizen or permanent resident must submit an "affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible." *Id.* § 54.053(3)(B).

---

[3] App. 5 (Ex. 2, Chelsie Kramer, *Texas Dream Act: Protecting Undocumented Students' Access to Higher Education is Economic, Educational Imperative*, Immigration Impact (Mar. 4, 2024), https://immigrationimpact.com/2025/03/04/texas-dream-act-undocumented-students-higher-education/ [hereinafter "Immigration Impact"]).

The Dream Act has allowed tens of thousands of Texas students to obtain an education and enter the workforce in their home state. Without this law, many of these students, including LUPE's members and Silva, would be forced out of higher education because out-of-state tuition rates are typically "three times higher than in-state rates."[4] While, as of 2021, Texas Dreamers made up less than 2% of students at Texas secondary and post-secondary education institutions (including public universities, community colleges, technical and state colleges, and health-related institutions), they still provided significant tax revenue to the State,[5] tuition revenue for their schools,[6] and wages, spending power, and economic activity to the Texas economy.[7]

Without the Dream Act, a substantial portion of these students will be forced to forgo their education. As a result, schools across Texas will likely lose tens of millions of dollars of funding, and Texas could lose millions of dollars in economic activity.

### B.  Procedural History

On June 2, 2025, the 89th Texas Legislative Session ended with the Legislature declining to repeal the Texas Dream Act. Two days later, the United States filed this lawsuit. In its Complaint, the United States argued that the Dream Act was preempted by the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1623(a). Dkt. 1 at 4. The United States asserted that the Dream Act expressly conflicts with § 1623(a) and, therefore, that it violates the Supremacy Clause of the U.S. Constitution. *See id.* at 4–5.

---

[4] App. 6 (*id.*).
[5] *See* App. 101–02 (Ex. 8, *Texas Dream Act Report*, Every Texan (May 2023), https://everytexan.org/wp-content/uploads/2023/05/Texas-Dream-Act-fact-sheet-May2023.pdf.).
[6] *See id.*
[7] App. 7–8 (Ex. 2, *Immigration Impact*, *supra* note 3).

Just hours after the Complaint was filed, Texas waived service and, together with the United States, filed a Joint Motion for Entry of Consent Judgment. *See* Dkts. 5, 6.[8] Without any adversarial briefing, argument, or opportunity for public or stakeholder input, the Parties agreed that federal law preempted sections 54.051(m) and 54.052(a) of the Texas Education Code. In their joint motion, the Parties urged the Court to declare those provisions unconstitutional and to permanently enjoin enforcement of the Dream Act "as applied to aliens who are not lawfully present in the United States." Dkt. 6 at 3. The Court did so, issuing an Order and Final Judgment that adopted the Parties' requested relief in full. *See* Dkt. 8.

On June 11, 2025, Students for Affordable Tuition filed a Motion to Intervene in this case, along with a Proposed Answer. Dkt. 9. On June 24, 2025, Proposed Intervenors filed their Emergency Motion to Intervene and Emergency Motion for Relief from Judgment or, in the Alternative, Motion to Alter or Amend Judgment ("Motion to Vacate"). These motions remain pending before the Court. Considering these developments, Proposed Intervenors now respectfully request that the Court stay its Consent Order and injunction pending final resolution of their request to vacate the Consent Order, to ensure that the issues are fully and fairly adjudicated on the merits.

### III.    ARGUMENT

A motion to stay is governed by a traditional four-factor test set out in *Nken v. Holder*, 556 U.S. 418, 426 (2009). *See also Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir.

---

[8] Such collusive suits have been resoundingly criticized by federal officials. *See* App. 94 (Ex. 7, U.S. Environmental Protection Agency, *Adhering to the Fundamental Principles of Due Process, Rule of Law, and Cooperative Federalism in Consent Decrees and Settlement Agreements* (Oct. 16,                    2017), https://archive.epa.gov/epa/sites/production/files/2017-10/documents/signed_memorandum_in_support_of_consent_decree_and_settlement_agreement _oct162017.pdf (Trump administration agency memorandum critiquing the "sue and settle" tactic used by the Obama administration, stating "The days of this regulation through litigation are terminated")).

1992) (citing *Drummond v. Fulton County Dep't of Family & Children's Servs.,* 532 F.2d 1001, 1002 (5th Cir. 1976), *rev'd on other grounds*, 547 F.2d 835 (5th Cir. 1977) (applying stay factors)). These factors are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The Supreme Court has stated that the "first two factors of the traditional standard are the most critical." *Id.* (citation omitted). Moreover, while each part of the four-part test must be met, the movant "need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981)).

Here, Proposed Intervenors meet each factor. First, Proposed Intervenors are likely to prevail on the merits of their Motion to Vacate. Second, Proposed Intervenors will be irreparably injured absent a stay. Finally, the Parties will face no injury or prejudice if the stay is granted, and the public interest favors the grant of stay.

### A. Proposed Intervenors Will Likely Succeed on the Merits of Their Motion to Vacate.

Proposed Intervenors present a "substantial case on the merits" that includes "serious legal question[s]," sufficient to warrant a stay of the injunction. *Arnold*, 278 F.3d at 439 (quoting *Ruiz*, 650 F.2d at 565); *see Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 393 (5th Cir. 2013) (finding movants entitled to stay where, on the first factor, they established likelihood of success

on claims that the court lacked jurisdiction to enter injunction, should have abstained, and lacked authority to act).

Proposed Intervenors have raised four bases for granting relief in their Motion to Vacate: *first*, vacatur for voidness under Rule 60(b)(4); *second*, vacatur based on surprise under Rule 60(b)(1); *third*, vacatur under Rule 60(b)(6); and *fourth*, altering judgment under Rule 59(e). Proposed Intervenors need only show a likelihood of success on **one** of those bases for vacatur, but have demonstrated a likelihood of success on all four.

### 1. Proposed Intervenors are likely to succeed on their Rule 60(b)(4) claim.

Rule 60(b) allows a court to vacate a judgment "to do substantial justice." *Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998); *cf. Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981) (noting, in the context of default judgments, that "[t]runcated proceedings are not favored and Rule 60(b) will be liberally construed in favor of trial on the full merits of the case"). Rule 60(b)(4) provides a court with the means to vacate a judgment that is void, either because the court lacked jurisdiction to decide the matter or because the judgement was entered "in a manner inconsistent with due process." *Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289, 298 (5th Cir. 2015) (quoting *Williams v. New Orleans Pub. Serv., Inc.,* 728 F.2d 730, 735 (5th Cir. 1984)). Here, Proposed Intervenors are likely to succeed on their 60(b)(4) motion on both grounds.

***First***, as detailed in Proposed Intervenors' Motion to Vacate, the Court lacked subject matter jurisdiction to enter judgment because no case or controversy existed between the Parties. It is a fundamental principle of the adversarial system of justice that, if both parties to an action "desire precisely the same result, there can be no case or controversy with the meaning of Article III." *Brown v. Watkins Motor Lines, Inc.,* 596 F.2d 129, 132 (5th Cir. 1979) (citing *Moore v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 47, 47 (1971)). An "ongoing adversarial

posture between the parties" is "[e]ssential to the concept of a controversy[] under Article III." *Matter of S. L. E. Inc.*, 674 F.2d 359, 364 (5th Cir. 1982).

Accordingly, when "all parties have agreed from the beginning of th[e] case that" the provisions in question "are unconstitutional" and disclaimed any intent to enforce such laws, there is insufficient adversity to confer jurisdiction. *Pool v. City of Houston*, 87 F.4th 733, 734 (5th Cir. 2023). Indeed, "[s]uch faux disputes do not belong in federal court." *Id.*; *see Moore*, 402 U.S. at 47–48 ("There is . . . no case or controversy within the meaning of Art. III of the Constitution" when "confront[ing] . . . the anomaly that both litigants desire precisely the same result, namely a holding that the . . . statute is unconstitutional."); *Muskrat v. United States*, 219 U.S. 346, 361 (1911) ("This attempt to obtain a judicial declaration of the validity of the act of Congress is not presented in a 'case' or 'controversy,' to which, under the Constitution . . . , the judicial power alone extends. . . . [T]he United States is made a defendant . . . , but it has no interest adverse to the claimants.").

In this case, the United States and Texas have been in lockstep from the inception of this truncated litigation. The Parties have no adverse interest and no case or controversy, and therefore the Court at all times lacked jurisdiction to decide this matter. The Parties agreed from the start that the Texas Dream Act was unconstitutional, which Proposed Intervenors dispute. Texas's legal representative failed to defend the constitutionality of its state law against a challenge by the United States and cheered the State's loss. Thus, no actual dispute existed for the Court to decide consistent with jurisdiction under Article III. Accordingly, the judgment is void for lack of jurisdiction.

**Second**, Rule 60(b)(4) requires vacatur because the Parties secured a consent decree in a manner inconsistent with due process. *F.D.I.C. v. SLE, Inc.*, 722 F.3d 264, 270 (5th Cir. 2013);

*Callon Petroleum Co. v. Frontier Ins. Co.,* 351 F.3d 204, 210 (5th Cir. 2003). The Supreme Court has long recognized that notice is an "elementary and fundamental" requirement of due process; it must be "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314 (1950). Moreover, the notice "must afford a reasonable time for those interested to make their appearance." *Id*. The Supreme Court has further emphasized that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Even temporary deprivations of protected interests require advance notice of the charges and "some kind of hearing," because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Goss v. Lopez*, 419 U.S. 565, 580 (1975).

These foundational protections apply with special force where a court's decree impacts the rights of individuals, organizations, and institutions without notice or consent. In a concurring opinion, Fifth Circuit Judge Rubin—joined by four other Circuit Judges—explained that a district court must do far more than offer "perfunctory approval" of a consent judgment. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring). Instead, the court must determine, based on an evidentiary record, that the decree is "fair, adequate and reasonable," and that it "does not put the court's sanction on . . . a decree that violates Constitution, statute, or jurisprudence," especially "[i]f the decree also affects third parties." *Id.* In *Terrazas v. Clements,* this Court reiterated this obligation, holding that a reapportionment consent decree could be approved only after the court verified its fairness, adequacy, and reasonableness "as to . . . affected third parties" through findings grounded in evidence, affidavit, or stipulation. 581 F. Supp. 1319, 1322–23 (N.D. Tex. 1983).

Here, the United States and Texas lodged a proposed decree and secured its entry the same day, without any notice to the students whose educational rights the Consent Order curtails, and without any hearing, evidentiary showing, or opportunity for those students to object or develop a record. The Consent Order thus exhibits precisely the defects the Supreme Court and Fifth Circuit have repeatedly condemned: it adjudicates and permanently restructures third-party rights through "secret, one-sided" proceedings that lack the most basic elements of due process. *See Mullane*, 339 U.S. at 314; *Goss*, 419 U.S. at 580; *Miami*, 664 F.2d at 441. Given the absence of both jurisdiction and due process in the Consent Order, the Proposed Intervenors are likely to succeed on the merits of their Rule 60(b)(4) claim.

### 2. In the alternative, Proposed Intervenors are likely to succeed on their Rule 60(b)(1) claim.

In the alternative, Proposed Intervenors are likely to succeed on the merits of their Rule 60(b)(1) motion based on surprise from the Consent Order. This provision allows a court to vacate its judgment in the case of "mistake, inadvertence, **surprise**, or excusable neglect." Fed. R. Civ. P. 60(b)(1) (emphasis added). A 60(b)(1) motion requires a court to consider "(1) the extent of prejudice to the [opposing party]; (2) the merits of the [moving party's] asserted defense; and (3) the culpability of [the moving party's] conduct." *Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1280 (5th Cir. 1985). Courts have set aside judgments under this provision where impacted parties' discovery of a judgment affecting them "surely was a surprise." *Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 313 (N.D. Tex. 2004) (quotation omitted).

In *Garcia*, Chief Judge Godbey granted a Rule 60(b)(1) motion based on "surprise" to intervenors at the discovery of a default judgment impacting their interests. *Id.* Reviewing the *Hibernia* factors, the court noted that the challenged judgment was entered "without any notice to

[i]ntervenors," due to no "negligence or carelessness" or ignorance by "[i]ntervenors or their attorneys," and "was not a result of an intentional choice by [i]ntervenors." *Id.* While the intervenors were "significantly prejudiced" by the default, the opposing party would face only "minimal" prejudice "because it [would] simply be required to prove its case on the merits in an adversarial forum, rather than obtaining a windfall judgment by forfeit." *Id.*

Here too, "[i]n a plain meaning sense," Proposed Intervenors suffered surprise from the entry of the Court's Consent Order warranting vacatur under Rule 60(b)(1). *See id.* at 312–13. Proposed Intervenors had no warning of the United States's Complaint, nor the Parties' joint motion, nor the entry of the Consent Order. In fact, only two days prior to the lawsuit, the Texas Legislature had kept the Dream Act on the books. Proposed Intervenors stand to suffer irreparable harm as a result of this rushed action, about which they had no foreknowledge, and in which they had no opportunity to participate—through no fault of their own. *See id.* at 313. The prejudice to the parties, on the other hand, is slight, as they would merely be required to engage in the ordinary course of litigation and "prove [the] case on the merits in an adversarial forum," in a case that they voluntarily commenced. *See id.* Proposed Intervenors have acted expeditiously in bringing their motion under this provision, engaging in no conduct that would counsel against relief. As such, Proposed Intervenors have set forth a serious case of surprise from this action and judgment and are likely to succeed on this factor.

### 3. *In the alternative, Proposed Intervenors are likely to succeed on the merits of their Rule 60(b)(6) claim.*

At minimum, Proposed Intervenors are likely to succeed on the merits of their Rule 60(b)(6) claim. Rule 60(b)(6) serves as a "catchall" when relief is warranted yet does not fit within one of the other provisions of Rule 60(b). *See Buck v. Davis,* 580 U.S. 100, 112 (2017); *see also Garcia,* 223 F.R.D. at 313 ("Intervenors would be entitled to relief under Rule 60(b)(6) if Rule

60(b)(1) were inapplicable."). This provision allows a court to reopen a case when "extraordinary circumstances" not covered elsewhere so warrant. *Kemp v. United States*, 596 U.S. 528, 533 (2022).

Rule 60(b)(6) relief is available "provided that the motion is made within a reasonable time and is not premised on one of the [other] grounds for relief . . . whenever such action is appropriate to accomplish justice[.]" *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Courts look to "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* ("[T]o perform its high function in the best way justice must satisfy the appearance of justice.") (quotations omitted).

Here, Proposed Intervenors present a substantial claim for vacatur under Rule 60(b)(6), especially based on the extraordinary circumstances of this case. Proposed Intervenors have acted within a reasonable time, seeking vacatur less than twenty days since the entry of the Consent Order, and will face substantial injustice if the Consent Order is not vacated in favor of full judicial testing of the United States's contentions. The Parties colluded to enjoin enforcement of a decades-old law that very recently had been considered, but left untouched, by the Texas Legislature; provided no argument, evidence, or other process to test their legal claims or the fairness of their proposed injunction; and the Attorney General offered no defense whatsoever of state law against federal invalidation. It is plain that the Parties sought to use collusive litigation to accomplish the preferred end that they were unable to accomplish through the democratic process. "Such a suit is collusive because it is not in any real sense adversary. It does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the

judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court." *United States v. Johnson*, 319 U.S. 302, 305 (1943).

With the rights of thousands at stake, "justice must satisfy the appearance of justice." *Liljeberg*, 486 U.S. at 864. Accordingly, Proposed Intervenors are likely to succeed on their Rule 60(b)(6) claim.

### 4.  *Alternatively, Proposed Intervenors are likely to succeed on their Rule 59(e) claim.*

Alternatively, Proposed Intervenors are likely to succeed on the merits of their Rule 59(e) claim. Under this provision, a party may move to "alter or amend a judgment . . . no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "Rule 59(e) has been interpreted as covering motions to vacate judgments, not just motions to modify or amend." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993) (citing *Foman v. Davis*, 371 U.S. 178, 180 (1962)). In considering such a motion, the Fifth Circuit has highlighted the need to balance finality with "the need to render just decisions on the basis of all the facts." *Id.* at 355.

A motion under this provision must "clearly establish either a manifest error of law or fact or present newly discovered evidence," *Camp v. Putnam*, 807 F. App'x 303, 305 (5th Cir. 2020) (quotation omitted), or else serve "the need to prevent manifest injustice." *Gabarick v. Laurin Mar. (Am.) Inc.*, No. CIV.A. 08-4007, 2010 WL 5437391, at *5 (E.D. La. Dec. 23, 2010). A court may grant a Rule 59(e) motion based on manifest injustice where "there exist[s] a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." *Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-CV-4295, 2012 WL 1952265, at *4 (S.D. Tex. May 30, 2012) (quotation omitted).

Here, Proposed Intervenors present a substantial case that entry of the Parties' agreed judgment involved a manifest error of law. The Parties brought an action before this Court in which they agreed at every stage, presenting no actual case or controversy, such that the Court lacked

Article III jurisdiction. The Parties presented no argumentation for the Court to consider and took no steps to ensure the interests of Texas students and educational institutions were protected. Proposed Intervenors received no notice and had no opportunity to participate in this action. The Consent Order was thus entered in such a manner as to encompass manifest errors of law.

Further, to be entitled to vacatur based on manifest injustice, a movant must establish "a 'want of equity' or some form of 'unfairness'" and a likelihood of "change in the outcome in the movant's favor." *In re Fuller*, 581 B.R. 236, 243 (W.D. Mich. 2018) (quoting *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 Fed. App'x 319, 331 (6th Cir. 2014)). There can be no doubt of the unfairness of the collusive agreement here, where the Parties moved in a manner that would leave Proposed Intervenors and others without any defense of their substantial interests for the entirety of this litigation.

As for a change of outcome, as noted above, an injunction is an extraordinary remedy. If the United States wishes to enjoin the Texas Dream Act, it must satisfy well-established requirements. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction *must* satisfy a four-factor test before a court may grant such relief.") (emphasis added). It is doubtful that the United States could meet the requirements for any injunctive relief, much less demonstrate, as necessary for a preliminary—or permanent—injunction, imminent, irreparable harm resulting from a long-established law. The United States has made no showing, let alone produced evidence, to merit an injunction.

Moreover, as to the constitutionality of the Dream Act, at least one state supreme court has rejected the statutory argument of the United States in a similar challenge to another state's version of this law. *Martinez v. Regents of Univ. of California*, 241 P.3d 855, 863 (Cal. 2010). There, the

California Supreme Court ruled against plaintiffs, finding California's similar exemption from out-of-state tuition predicated on criteria beyond just residency was consistent with § 1623. Here too, the Texas Dream Act permits in-state tuition based on a set of criteria beyond mere residency. Section 54.052(a)(3) provides that a student can meet its exemption requirements by: 1) graduating from a Texas high school, 2) maintaining a residence in Texas for the three years prior to graduating from high school, and 3) maintaining a residence in Texas for the year preceding enrollment in a higher education institution. Tex. Ed. Code § 54.052(a)(3). Because the Dream Act's exemption is not based squarely on residency, it is not preempted by the federal statute.

At minimum, *Martinez* calls into question the United States's likelihood of success on the merits. *See* 241 P.3d at 863. An alternative statutory construction—and the assertion that § 1623 requires states to determine "lawful presence"—implicates severe constitutional concerns. Beyond the merits, the United States's ability to establish the other *Winter* factors is circumspect at best. Given these deficiencies, the United States would be hard-pressed to justify injunctive relief if confronted with adversarial process—satisfying Proposed Intervenors' burden to show a likelihood of change in the Consent Order in their favor.

Proposed Intervenors have, therefore, presented a substantial case, with serious legal questions, on the merits of their Motion to Vacate. Proposed Intervenors have, therefore, established a likelihood of success on the merits, satisfying the first factor for entry of a stay.

### B.  Proposed Intervenors Will Likely Suffer Irreparable Harm in the Absence of a Stay.

On the second factor, Proposed Intervenors are likely to suffer irreparable harm if a stay is not entered. To satisfy this factor, the harm must be more than a mere possibility. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

To begin with, the public is irreparably harmed by the Parties' effective nullification of core democratic processes. It is well-established that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

Further, Proposed Intervenors will suffer irreparable harm unless this Court acts to stay the effect of its Consent Order. *See, e.g.*, *Young Conservatives of Texas Found. v. Univ. of N. Texas*, 609 F. Supp. 3d 504, 514 (E.D. Tex. 2022) (recognizing that "a significant impact on students' financial condition" can constitute a "substantial injury"); *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 434 (5th Cir. 2016) ("Petitioners have raised threatened harms—including unemployment and the permanent closure of plants—that would arise during the litigation if a stay is not granted, that are irreparable, *and* that are great in magnitude."); *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) ("Jane Does have an interest in the employment opportunities that would be available to them if they are granted deferred action and employment authorization . . ."). This collusive action by the United States and the Texas Attorney General upended the lives of Proposed Intervenors, their members, and thousands of Dreamers across the State.[9] For instance, Proposed Intervenor Oscar Silva, who faces up to a threefold increase in tuition costs, may have to withdraw from college.[10] At least six LUPE members were affected by the Consent Order and sought guidance from LUPE regarding their college plans.[11] And the Consent Order impacts ACC's revenues, enrollment, prospective students, reputation, administrative processes,

---

[9] *See generally* App. 122–29 (Ex. 13, Jessica Priest, *Undocumented students Rethink their college dreams after Texas cuts their access to cheaper tuition*, The Tex. Tribune (June 14, 2025), https://www.texastribune.org/2025/06/14/texas-undocumented-students-tuition-costs/).
[10] App. 137 (Ex. 15, Decl. of Oscar Silva ¶ 9).
[11] App. 117 (Ex. 11, Decl. of Tania Chavez ¶ 26).

marketing, recruitment, public relations, scholarships, fundraising, campus life, academic programs, and student support services.[12]

Proposed Intervenors have a significant interest in their access to education. A college education can shape the rest of a college student's life, including which employment opportunities will be available to them, the wages they will earn, the taxes they will pay, the support they will be able to provide for their families, and other meaningful contributions they will make to society.

Proposed Intervenor Oscar Silva will likely be forced to withdraw from school if he loses in-state tuition under the Texas Dream Act. Silva is a 24-year-old student who has lived in Texas since he was one.[13] He grew up in Garland, where he graduated from elementary, middle, and high school, before moving to Denton, Texas, where he currently resides.[14] Silva is now a student at the University of North Texas ("UNT"), in a joint bachelor's and master's program, and he is on track to graduate in Spring 2026 with a B.S. in Economics and a B.S. and M.S. in Accounting.[15]

Silva can attend UNT thanks to the Texas Dream Act. As a life-long Texan and Texas high school graduate, he has been eligible—by meeting the statutory criteria and signing the required affidavit—for in-state tuition.[16] This tuition benefit, plus merit-based, one-time award scholarships he has earned, made his education possible.[17]

Silva's graduation next spring hinges on his continued eligibility for in-state tuition; without it, he will face "extreme financial duress" and will likely have to withdraw from school.[18]

---

[12] App. 141–43 (Ex. 16, Decl. of Russell Lowery-Hart, PhD ¶¶ 5–6).
[13] App. 136 (Ex. 15, Decl. of Oscar Silva ¶ 2).
[14] *Id.*
[15] *Id.* (¶ 3).
[16] *Id.* (¶ 5).
[17] *Id.* (¶ 5–8).
[18] App. 137 (¶ 9).

Silva cannot afford to pay out-of-state tuition.[19] UNT has never classified him as an out-of-state student, and he has enrolled in the Fall Semester contingent on the Dream Act's in-state tuition.[20]

Proposed Intervenor LUPE has, for decades, dedicated itself to these ends by promoting educational access for its members, many of whom are Dreamers.[21] With members' lives upended in the days since the Consent Order, LUPE staff have spent hours each day providing support—even as they themselves continue to search for answers. The eight organizers LUPE trained in November 2024 to deliver college-access curricula must now be retrained, and the organization is scrambling to rewrite its flagship Undocumented Student Guide so families are not left with outdated information.[22] Since the Consent Order issued, Executive Director Tania Chavez and at least two other staff members have each spent several hours every day fielding panicked calls, coordinating volunteers, and pressing state and university officials for clarity on implementation.[23] LUPE has redirected its LUPE_Youth social-media platforms to provide real-time updates, convened a virtual community town hall on June 11, 2025, and diverted resources from other programs to mount a rapid public-education and advocacy response.[24] The human stakes are immediate: since June 4, 2025, Ms. Chavez personally counseled six LUPE members—impacted individuals who, confronted with unaffordable out-of-state tuition, will likely need to pause or delay their studies altogether.[25] With no meaningful guidance forthcoming from the State or

---

[19] *Id.* (¶ 14).
[20] *Id.* (¶¶ 9, 12).
[21] App. 113–14 (Ex. 11, Decl. of Tania Chavez ¶¶ 13–17).
[22] App. 114–15 (¶ 18).
[23] App. 116 (¶ 22).
[24] App. 115, 117 (¶¶ 19, 24).
[25] App. 117 (¶ 26).

universities, LUPE is shouldering the burden of crisis response at considerable cost to its mission and to the futures of the young people it serves.[26]

As ACC's Chancellor Dr. Russell Lowery-Hart explains, the Consent Order impacts Proposed Intervenor ACC's revenues, enrollment, prospective students, reputation, administrative processes, marketing, recruitment, public relations, scholarships, fundraising, campus life, academic programs, and student support services.[27] ACC's funding is derived from a combination of sources, including tuition and fee payments from enrolled students.[28] ACC estimates that approximately 440 of its students will now face a four-fold tuition increase, which, in turn, is expected to lead to the withdrawal of hundreds of students.[29] The tuition increase will also deter prospective students, reducing the pool of qualified applicants from Texas high schools.[30] This all leads to revenue loss, and any loss of revenue can impact ACC's academic programs, student support services, and campus operations.[31]

The administrative burdens are also meaningful. ACC may have to create new administrative processes to determine which students are no longer eligible for in-state tuition, notify them, recalculate their tuition bills, and manage appeals or requests for reconsideration.[32] The abrupt change also undermines ACC's efforts to market itself as an accessible, inclusive, and affordable institution for all Texas high school graduates, triggering public relations, marketing, and recruitment costs. And the demand for scholarships will rise, placing greater burden on

---

[26] App. 114–18 (¶¶ 18–29).
[27] App. 141–42 (Ex. 16, Decl. of Russell Lowery-Hart, PhD ¶ 5)
[28] App. 140 (¶ 3).
[29] App. 141 (¶ 5a).
[30] *Id.* (¶ 5b).
[31] *Id.*
[32] App. 142 (¶ 5d).

existing resources. [33] As Dr. Lowery-Hart explains, "the loss of these students will have a cascading effect on campus life, academic programs, and student support services." [34]

    The irreparable harm to Proposed Intervenors is imminent. Texas colleges and universities will soon start assessing tuition at vastly higher rates than these in-state students have ever had to pay. ACC (and other colleges and universities) will immediately begin incurring expense and administrative burden in order to track affected students. Students will be forced to make life-altering decisions based on this abrupt restriction of their access to public education, and many will have to forego their higher education entirely In fact, Texas educational institutions have received a directive from the Texas Higher Education Coordinating Board to "assess the population of [affected] students" and to implement new tuition requirements by August 2025. [35] Proposed Intervenors have reason to believe additional guidance could issue as soon as July 24, 2025. Proposed Intervenors, and thousands of other Texas students, face imminent, irreparable harm in the coming weeks and months. Consequently, this factor favors granting a stay.

### C. The Balance of Equities and Public Interest Favor a Stay.

    The Parties face no prejudice or irreparable harm from a stay, and the public interest favors granting a stay pending final resolution of the Motion to Vacate. The Fifth Circuit has recognized that preserving the status quo "is an important equitable consideration in the stay decision." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (quoting *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359, (1978) (quotations omitted)); *see Americans for Beneficiary Choice v. United States Dep't of Health & Hum. Servs.*, No. 4:24-CV-00439-O, 2024 WL 3297527, at *7 (N.D.

---

[33] *Id*. (¶ 5f).
[34] App. 142–43 (¶ 6).
[35] App. 108 (Ex. 10, Memorandum from Texas Higher Education Coordinating Board, dated June 18, 2025).

Tex. July 3, 2024) (balance of equities and public interest warranted stay of increase in cost of Medicare program where "[t]he harms [movants] face[d] by failing to maintain the status quo [we]re substantially more severe than those faced by [defendant]" and "[t]he Court [wa]s not convinced that the . . . compensation framework—which ha[d] been in place for over fifteen years—[wa]s so flawed that it require[d] these sweeping new requirements now"). The Texas Dream Act was the status quo for more than two decades. Proposed Intervenors request the Court return to that status quo while they defend the constitutionality of the law for the first time before this Court.

The balance of the equities clearly favors Proposed Intervenors. The United States has identified no harm from the Texas Dream Act. By contrast, a stay of the Consent Order will return the status quo and impose no harm on the Parties, simply allowing this case to follow the ordinary judicial process and scrutiny of the United States's claims. Though the Parties may want to avoid such scrutiny, any interest in speed cannot outweigh the value of robust judicial inquiry. *Nken*, 556 U.S. at 427 ("A reviewing court must bring considered judgment to bear on the matter before it, but that cannot always be done quickly enough to afford relief to the party aggrieved by the order under review. The choice for a reviewing court should not be between justice on the fly or participation in what may be an 'idle ceremony.'") (quoting *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 10 (1942)). When viewed against the substantial, imminent, and irreparable harms Proposed Intervenors face, the balance of the equities clearly tips in favor of a stay.

Further, the public interest favors a stay here. In the absence of a stay, in the coming weeks and months, countless students will be forced to make the life-altering decision to give up on higher education, to no one's benefit. The public is also disserved when its leaders are prevented "from effectuating statutes enacted by representatives of its people." *New Motor Vehicle Bd.*, 434 U.S.

at 1351. A stay here will allow the proper time for rigorous testing of the United States's claims, to ensure that the interest of all Texans in an educated public receives the defense it is due. Consequently, the balance of the equities and public interest favor a stay.

## IV.    CONCLUSION

Given the urgency at stake—college enrollment decisions, approaching tuition assessment, and deposit deadlines at educational institutions across Texas—and to allow time for an appeal, if necessary, Proposed Intervenors request expedited consideration of their motions. The Texas Higher Education Coordinating Board, for example, instructed on June 18, 2025 that "each institution must assess the population of [affected] students," requiring immediate action by colleges.[36] Proposed Intervenors have reason to believe additional guidance could issue as soon as July 24, 2025. Accordingly, Proposed Intervenors respectfully request, to the extent possible, that the Court require any responses to this Motion and their Emergency Motion for Stay within one week; any replies within three days of any response; and a ruling by July 11, 2025.

For the above reasons, Proposed Intervenors respectfully request this Court grant an emergency stay of its June 4, 2025 Order and Final Judgment pending final determination on the merits of Proposed Intervenors' Emergency Motion to Intervene and Emergency Motion for Relief from Judgment or, in the Alternative, Motion to Alter or Amend Judgment.

---

[36] App. 108 (Ex. 10, Memorandum from Texas Higher Education Coordinating Board, dated June 18, 2025).

Dated: June 24, 2025

Respectfully submitted,

/s/ Andrés Correa
Andrés Correa
Texas Bar No. 24076330
acorrea@lynnllp.com
Christopher Patton
Texas Bar No. 24083634
cpatton@lynnllp.com
Yaman Desai
Texas Bar No. 24101695
ydesai@lynnllp.com
Kyle A. Gardner
Texas State Bar No. 24116412
kgardner@lynnllp.com
Zhenmian Xu
Texas Bar No. 24135820
sxu@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

Kassandra Gonzalez*
Texas Bar No. 24116439
kassandra@texascivilrightsproject.org
Molly Petchenik
Texas Bar No. 24134321
molly@texascivilrightsproject.org
Daniel Woodward*
Texas Bar No. 24138347
danny@texascivilrightsproject.org
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 182 Telephone
(512) 474-0726 Facsimile

Daniel Hatoum*
Texas Bar No. 24099136
daniel@texascivilrightsproject.org
**TEXAS CIVIL RIGHTS PROJECT**
1017 W. Hackberry Ave.
Alamo, TX 78516
(512) 474-5073 ext. 182 Telephone

(512) 474-0726 Facsimile

Efrén C. Olivares
Texas Bar No. 24065844
Federal Bar No. 1015826
olivares@nilc.org
Tanya Broder*
California Bar No. 136141
broder@nilc.org
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20005-9997
(213) 674-2817 Telephone

David Donatti
Texas Bar No. 24097612
ddonatti@aclutx.org
Adriana Pinon
Texas Bar No. 24089768
apinon@aclutx.org
Edgar Saldivar
Texas Bar No. 24038188
esaldivar@aclutx.org
Sarah Corning*
Texas Bar No. 24144442
scorning@aclutx.org
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Joshua M. Salzman*
D.C. Bar No. 982239
jsalzman@democracyforward.org
Brian D. Netter*
D.C. Bar No. 979362
bnetter@democracyforward.org
Paul R.Q. Wolfson*
D.C. Bar No. 414759
pwolfson@democracyforward.org
Skye L. Perryman*
Texas Bar No. 24060411
sperryman@democracyforward.org
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043

Tel: (202) 448-9090

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PROPOSED
INTERVENORS LA UNIÓN DEL
PUEBLO ENTERO, AUSTIN
COMMUNITY COLLEGE, AND
OSCAR SILVA**

## CERTIFICATE OF CONFERENCE

I certify that pursuant to LR 7.1, on June 23, 2025 the undersigned emailed counsel for the Parties asking whether they could agree to the relief requested herein. Counsel for the State of Texas is opposed. As of this filing, counsel for the United States have not responded.

*/s/ Andrés Correa*
Andrés Correa

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

*/s/ Andrés Correa*
Andrés Correa

4930-0103-1504, v. 1